18-943-cr
*United States v. Al Farekh*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2019

No. 18-943-cr

UNITED STATES OF AMERICA,
*Appellee*,

v.

MUHANAD MAHMOUD AL FAREKH,
*Defendant-Appellant*,

On Appeal from the United States District Court
for the Eastern District of New York

ARGUED: DECEMBER 12, 2019
DECIDED: APRIL 16, 2020

Before: CABRANES, LOHIER, *Circuit Judges*, and REISS, *Judge*.*

---

* Judge Christina Reiss, of the United States District Court for the District of Vermont, sitting by designation.

Defendant-Appellant Muhanad Mahmoud Al-Farekh ("Al-Farekh"), a U.S. citizen who traveled to Pakistan to join al-Qaeda and wage violent jihad against the United States, appeals from a judgment of the U.S. District Court for the Eastern District of New York (Brian M. Cogan, *Judge*) convicting him, following a jury trial, of, among other things, using explosives, conspiring to murder U.S. nationals, conspiring to use a weapon of mass destruction, conspiring to bomb a U.S. government facility, and providing material support to terrorists.

On appeal, Al-Farekh raises a number of challenges. We address three of those challenges here: (1) whether a district court abuses its discretion where it denies a defense counsel with the appropriate security clearance access to motions filed by the Government *ex parte* pursuant to section 4 of the Classified Information Procedures Act ("CIPA"); (2) whether a custodial interrogation that takes place overseas over a period of several weeks and involves the display of hundreds of photographs as part of a foreign country's counterterrorism investigation is unduly suggestive, thereby rendering inadmissible an out-of-court photo identification of the defendant; and (3) whether a district court abuses its discretion when it limits the cross-examination of a fingerprint examiner to preclude references to a fingerprint misidentification in a wholly unrelated case—*i.e.*, the Brandon Mayfield incident.

We answer all three questions in the negative. Specifically, we hold that, under the circumstances presented in this case, the District

Court did not err in adjudicating the Government's CIPA motions *ex parte* and *in camera*, admitting the out-of-court photo identification of Al-Farekh, and limiting the cross-examination of the Government's fingerprint examiner. Accordingly, the judgment of the District Court is **AFFIRMED**.

---

RICHARD M. TUCKER, Assistant United States Attorney (David C. James, Douglas M. Pravda, Saritha Komatireddy, Assistant United States Attorneys; Alicia Cook, Trial Attorney, Counterterrorism Section, United States Department of Justice, Washington, D.C., *on the brief*), *for* Richard P. Donoghue, United States Attorney, Eastern District of New York, Brooklyn, NY, *for Appellee*.

LAWRENCE M. STERN (Robert J. Boyle, *on the brief*), New York, NY, *for Defendant-Appellant*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

Defendant-Appellant Muhanad Mahmoud Al-Farekh ("Al-Farekh") is a U.S. citizen who traveled to Pakistan in 2007 to join al-Qaeda. He became a leader in the terrorist organization and waged violent jihad against the United States and its allies in the Middle East. As a member of al-Qaeda, Al-Farekh conspired to bomb a U.S. military

base in Afghanistan. In 2015, agents of the Federal Bureau of Investigation ("FBI") arrested him in Pakistan and brought him to the United States to be prosecuted for his crimes.[**]

Following a jury trial, Al-Farekh was convicted of, among other things, using explosives, conspiring to murder U.S. nationals, conspiring to use a weapon of mass destruction, conspiring to bomb a U.S. government facility, and providing material support to terrorists. The U.S. District Court for the Eastern District of New York (Brian M. Cogan, *Judge*) sentenced Al-Farekh principally to 45 years' imprisonment.

Al-Farekh appeals the District Court's judgment and raises a number of challenges to his conviction and sentence. We decide here three of those challenges, leaving the others to be addressed in a summary order filed simultaneously herewith: (1) whether a district court abuses its discretion where it denies a defense counsel with the appropriate security clearance access to motions filed by the Government *ex parte* pursuant to section 4 of the Classified Information Procedures Act ("CIPA")[1]; (2) whether a custodial

---

[**] Among the various issues raised in this appeal there are non-classified facts that were filed under seal with leave of Court (and upon consent of both parties) in confidential and redacted briefs (and in a sealed appendix) filed by both the Defendant and the Government. In light of the sensitive nature of this information and upon due consideration of the strong presumption of public access that attaches to judicial documents, on April 6, 2020, we ordered the Clerk of Court to make available to all counsel a copy of our sealed opinion. We also ordered counsel for the parties to confer and jointly propose what, if any, redactions should be made to the sealed opinion before it is made available for public viewing. We

interrogation that takes place overseas over a period of several weeks and involves the display of hundreds of photographs as part of a foreign country's counterterrorism investigation is unduly suggestive, thereby rendering inadmissible an out-of-court photo identification of the defendant; and (3) whether a district court abuses its discretion when it limits the cross-examination of a fingerprint examiner to preclude references to a fingerprint misidentification in a wholly unrelated case that took place 16 years ago—*i.e.*, the Brandon Mayfield incident.[2]

We answer all three questions in the negative. Specifically, we hold that, in the circumstances presented here, the District Court did

---

note that the limited redactions in this opinion, which relate to information in the sealed record in this case, were jointly proposed by counsel and were accepted and made by this Court.

[1] 18 U.S.C. app. 3, § 4.

[2] In 2004, Spanish authorities recovered various fingerprints in connection with the terrorist attack on the commuter trains in Madrid, Spain, and shared the fingerprints with the FBI. *See Mayfield v. United States*, 599 F.3d 964, 966 (9th Cir. 2010). FBI examiners erroneously identified one of the fingerprints to be that of Brandon Mayfield, a U.S. citizen and lawyer who resided in Oregon. *See id.* The FBI arrested Mayfield in connection with the train bombings. *See id.* at 967. After the Spanish authorities concluded that the fingerprint was a negative match of Mayfield's fingerprint and identified the fingerprints as belonging to an Algerian national, Mayfield was released. *See id.* The Department of Justice's Office of Inspector General prepared an extensive report acknowledging several errors in the FBI's investigation—errors that "could have been prevented through a more rigorous application of several principles of latent fingerprint identification." U.S. DEP'T OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL, A REVIEW OF THE FBI'S HANDLING OF THE BRANDON MAYFIELD CASE, at 6 (2006), *available at* https://oig.justice.gov/special/s0601/final.pdf.

not err in adjudicating the Government's CIPA motions *ex parte* and *in camera*, admitting the out-of-court photo identification of Al-Farekh, and limiting the cross-examination of the Government's fingerprint examiner.

In the summary order filed today, we decide the other issues raised in Al-Farekh's appeal. In sum, the judgment of the District Court is **AFFIRMED**.

## I.  BACKGROUND

Al-Farekh is a U.S. citizen who was born in 1985 in Houston, Texas and was raised in the United Arab Emirates. Between 2005 and 2007, Al-Farekh attended the University of Manitoba in Canada. According to the Government, Al-Farekh dropped out of college; traveled to Pakistan; joined al-Qaeda; became a senior leader of the terrorist organization; and was responsible for, among other things, conspiring to perpetrate a violent attack against civilian and military personnel in a U.S. military base in Afghanistan.

On January 8, 2015, Al-Farekh was charged by complaint with conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A. Several weeks later, on February 1, FBI agents arrested Al-Farekh in Pakistan and brought him to the United States.

On May 28, 2015, a grand jury returned an indictment charging Al-Farekh for the same offense, and on January 6, 2016, and January 5, 2017, a grand jury returned superseding indictments. Al-Farekh was tried on the basis of the second superseding indictment for the

following counts: using explosives in violation of 18 U.S.C. § 844(f)(1)–(2) (Count One); conspiring to murder U.S. nationals in violation of 18 U.S.C. § 2332(b)(2) (Count Two); conspiring to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a)(Count Three); conspiring to use a weapon of mass destruction by a U.S. national in violation of 18 U.S.C. § 2332a(b) (Count Four); conspiring to bomb a U.S. government facility in violation of 18 U.S.C. § 2332f (Count Five); conspiring to provide, attempting to provide, and providing material support to terrorists in violation of 18 U.S.C. § 2339A(a) (Counts Six and Seven); and conspiring to provide, attempting to provide, and providing material support to the Foreign Terrorist Organization al-Qaeda in violation of 18 U.S.C. § 2339B (Counts Eight and Nine).

## A. Pretrial Proceedings

### 1. CIPA Materials

The Government's case against Al-Farekh included classified material. On June 30, 2016, the Government filed an *ex parte* classified motion for a protective order pursuant to § 4 of CIPA, which Al-Farekh opposed. On August 23, 2016, after reviewing the classified materials, the District Court granted the Government's *ex parte* motion. On April 28, 2017, the Government filed *ex parte* a supplemental CIPA motion, which the District Court granted on May 24, 2017.

### 2. Deposition of Overseas Witness

The Government's case against Al-Farekh also included testimony by a former al-Qaeda collaborator and later Government

witness residing in the Middle East. On November 8, 2016, the Government filed a motion for leave to take the witness's testimony by deposition pursuant to Federal Rule of Criminal Procedure 15. To protect the witness's safety and that of his family, the Government also asked the Court to permit the witness to testify under a pseudonym and to limit the cross-examination into the witness's identity, country of origin, nationality, current location, and his ongoing cooperation with authorities. The Government did not, however, seek to limit its disclosures to Al-Farekh on these subjects. On December 9, 2016, the District Court granted the motion.

On March 14, 2017, the witness, who testified under the pseudonym "Sufwan Murad," was deposed. Murad was the driver and bodyguard of al-Qaeda leader Haji Mohammed. Murad testified that he saw a person he knew as Abdullah al-Shami, a senior official of al-Qaeda's external operations group, on two separate occasions while driving Mohammed to deliver monthly stipends to the members of al-Shami's al-Qaeda brigade. Murad described both encounters in significant detail. Murad also identified a photograph of Al-Farekh as depicting the person he knew as al-Shami.

The able district judge presided over the Rule 15 deposition. On July 8, 2017, Al-Farekh moved to suppress Murad's out-of-court photo identification of Al-Farekh and the related testimony regarding Al-Farekh's membership in al-Qaeda. The District Court denied the motion.

### B. Trial and Sentencing Proceedings

The trial of Al-Farekh started on September 12, 2017, and lasted approximately two weeks.

#### 1. The Government's Case

As a student at the University of Manitoba, Al-Farekh joined the Muslim Students Association, where he met and befriended his future al-Qaeda co-conspirators, Ferid Imam and Maiwand Yar. Al-Farekh, Imam, and Yar discussed and exchanged radical jihadist videos, including some lectures by Anwar al-Awlaki, a now-deceased terrorist who was the leader of al-Qaeda in the Arabian Peninsula. On March 8, 2007, Al-Farekh, Imam, and Yar dropped out of college and flew from Canada to Pakistan, where they headed to the Federally Administered Tribal Areas to join al-Qaeda.

On January 19, 2009, two vehicles carrying vehicle-borne improvised explosive devices ("VBIED") approached Forward Operating Base Chapman, an important U.S. military base in Afghanistan. The plan was for the first vehicle to detonate its VBIED at the gate so the second vehicle could detonate its significantly larger and more powerful VBIED inside the base and maximize the number of casualties and damage. The first VBIED exploded as planned, injuring several Afghan nationals and a U.S. soldier; the second vehicle was stuck in the crater caused by the first VBIED and did not explode. The driver of the second vehicle was shot and killed after abandoning the vehicle. Latent fingerprints and a hair follicle were recovered from adhesive packing tape in the undetonated VBIED.

According to the Government, 18 fingerprints and the hair follicle were matched to Al-Farekh.

### 2. Al-Farekh's Case

During the Government's case-in-chief, Al-Farekh's counsel, through rigorous cross-examination, focused on undermining the credibility of the Government's witnesses and the reliability of its evidence. During his own case-in-chief, Al-Farekh did not call any witnesses but introduced a stipulation recounting certain inconsistent, out-of-court statements by Murad and another Government witness.

### 3. The Verdict and Sentence

On September 29, 2017, the jury found Al-Farekh guilty of all nine counts of the second superseding indictment. On March 13, 2018, the District Court sentenced Al-Farekh principally to 45 years' imprisonment.

## II.    DISCUSSION

On appeal, Al-Farekh challenges many of the District Court's evidentiary rulings, as well as the reasonableness of his sentence. As stated above, we address here only three of the challenges to his conviction: (1) whether the District Court erred in reviewing and adjudicating the Government's CIPA motions *ex parte* and *in camera*; (2) whether the District Court erred in admitting Murad's out-of-court photo identification of Al-Farekh; and (3) whether the District Court erred in limiting Al-Farekh's cross-examination of the Government's fingerprint examiner.

For the reasons stated below, we find no error in the District Court's rulings and thus affirm the District Court's judgment.

## A. The *Ex Parte* Review and Adjudication of CIPA Motions

Al-Farekh argues that the District Court's *ex parte*, *in camera* review and adjudication of the Government's filings made pursuant to § 4 of CIPA constitutes reversible error. More specifically, Al-Farekh argues that the District Court was required to provide him with access to the Government's filings because his counsel had the requisite security clearance.[3] We review the challenge to the District Court's handling of the CIPA motions for "abuse of discretion."[4]

CIPA establishes procedures for the handling of "[c]lassified information" in criminal cases.[5] The purpose of CIPA is "to protect[ ] and restrict [ ]the discovery of classified information in a way that does not impair the defendant's right to a fair trial."[6] Section 4 of CIPA

---

[3] We have reviewed the source materials underlying the Government's CIPA submissions and conclude that the District Court did not err in determining that the Government's summaries of those materials were adequate.

[4] *United States v. Abu-Jihaad*, 630 F.3d 102, 140, 143 (2d Cir. 2010).

[5] 18 U.S.C. app. 3, § 1(a) (defining "[c]lassified information" as "any information or material that has been determined by the United States Government pursuant to an Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security").

[6] *Abu-Jihaad*, 630 F.3d at 140 (quoting *United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008) (alterations in original and quotation marks omitted)).

governs the discovery of classified information by criminal defendants. It provides:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.[7]

We have read this provision to confirm the "district courts' power under Federal Rule of Criminal Procedure 16(d)(1) to issue protective orders denying or restricting discovery for good cause, which includes information vital to the national security."[8]

---

[7] 18 U.S.C. app. 3, § 4.

[8] *Abu-Jihaad*, 630 F.3d at 140 (quoting *United States v. Stewart*, 590 F.3d 93, 130 (2d Cir. 2009) (quotation marks omitted)). Federal Rule of Criminal Procedure 16(d)(1) provides in relevant part that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief"

As relevant here, we have held that § 4 of CIPA and Federal Rule of Criminal Procedure 16(d)(1) "authorize *ex parte* proceedings" and that a "district court act[s] well within its discretion in reviewing [CIPA] submissions *ex parte* and *in camera*."[9] As such, notwithstanding the rarity of *ex parte* proceedings in criminal matters, there can be no question that a district court's *ex parte*, *in camera* adjudication of CIPA motions falls squarely within the authority granted by Congress.

Al-Farekh argues that this Court "has sanctioned *ex parte* proceedings in CIPA cases" only where defense counsel did not possess the requisite security clearance.[10] Al-Farekh asks us to hold that, where a defense counsel has an appropriate security clearance, the District Court may not adjudicate the CIPA motions *ex parte* and must give defense counsel access to the classified information.

We decline to adopt any such bright-line rule. Nothing in the text of § 4 limits the District Court's authority to review classified information *ex parte* only where defense counsel lacks a security clearance. Nor do our decisions on § 4 of CIPA—*United States v. Aref* and *United States v. Abu-Jihaad*—turn on that fact. To the contrary, as

---

and that "[t]he court may permit a party to show good cause by a written statement that the court will inspect ex parte."

[9] *Abu-Jihaad*, 630 F.3d at 143; *see also Stewart*, 590 F.3d at 132; *Aref*, 533 F.3d at 81.

[10] Appellant's Br. at 39 (noting that defense counsel in *Aref* and *Abu-Jihaad* did not possess the appropriate security clearance).

13

explained below, Al-Farekh's proposed rule cannot be reconciled with CIPA as enacted by Congress and interpreted by our Court.

Starting with the text, the plain language of § 4 makes clear that a district court is required to decide in the first instance whether the Government's classified information is discoverable and the extent and form of any disclosure to the defendant.[11] The structure of the CIPA statute reinforces our reading of § 4. Congress knew how to provide for the participation of defendants in certain *in camera* proceedings, as it did in § 6 of CIPA.[12] Yet, notably, Congress did not require such participation in § 4 proceedings. Instead, § 4 simply provides that an *ex parte* motion by the Government may "be inspected by the court alone."[13]

Section 4 also authorizes the Government to ask a district court to, among other things, substitute a summary of the classified

---

[11] 18 U.S.C. app. 3, § 4 (authorizing the deletion of classified information from discoverable materials or the substitution of a summary or statement for the classified information).

[12] 18 U.S.C. app. 3, § 6(a) (authorizing the Government to "request the court to conduct a hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding," requiring the court to "conduct such a hearing" upon the Government's request, and providing that any such hearing "shall be held in camera if the Attorney General certifies to the court . . . that a public proceeding may result in the disclosure of classified information"); *see also* Sen. Rep. No. 96–823, at 7–8.

[13] 18 U.S.C. app. 3, § 4.

information or a statement of the discoverable information.[14] And § 7 authorizes the Government to file an interlocutory appeal from a decision denying a motion for a protective order.[15] If a defendant's counsel was required to participate in a § 4 proceeding and be provided access to classified information, as Al-Farekh contends, the alternative relief authorized in these provisions would be rendered insignificant, if not meaningless.

The legislative history also supports our reading of the statute. The House Report states, for example, that "since the government is seeking to withhold classified information from the defendant, an adversary hearing with defense knowledge would defeat the very purpose of the discovery rules."[16] And our reading is consistent with that of other Circuits that have acknowledged, either explicitly or implicitly, the lawfulness and appropriateness of *ex parte* proceedings under § 4 of CIPA.[17] More generally, it is consistent with the well-

---

[14] *See id.*

[15] *See id.* app. 3, § 7(a) ("An interlocutory appeal by the United States taken before or after the defendant has been placed in jeopardy shall lie to a court of appeals from a decision or order of a district court in a criminal case authorizing the disclosure of classified information, imposing sanctions for nondisclosure of classified information, or refusing a protective order sought by the United States to prevent the disclosure of classified information.").

[16] H.R. Rep. No. 96–831, pt. 1, at 27 n.22 (1980); *accord Abu-Jihaad*, 630 F.3d at 143 (quoting *Aref*, 533 F.3d at 81).

[17] *See, e.g.*, *United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008) ("The right that section four confers on the government would be illusory if defense counsel were allowed to participate in section four proceedings because defense

settled notion that *ex parte*, *in camera* review can be an appropriate procedure for district judges to rely upon when called to handle particularly sensitive documents.[18]

As a practical matter, because it may well be that the information in a § 4 motion is not discoverable at all, Al-Farekh's theory would permit a defendant represented by counsel with a security clearance to gain access to classified information that would otherwise be unavailable to the defendant. That possibility could

---

counsel would be able to see the information that the government asks the district court to keep from defense counsel's view."); *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) (explaining that "*ex parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the [classified] information"); *accord United States v. Hanna*, 661 F.3d 271, 295 (6th Cir. 2011) (same); *United States v. Mejia*, 448 F.3d 436, 457–58 (D.C. Cir. 2006) (same).

[18] *Cf. In re The City of New York*, 607 F.3d 923, 948–49 (2d Cir. 2010) (providing guidance to district courts on how to handle especially sensitive materials to analyze a claim for law enforcement privilege) (citing *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003) (describing the presentation of documents for *in camera* review as a "practice both long-standing and routine in cases involving claims of privilege" and citing illustrative cases); *United States v. Wolfson*, 55 F.3d 58, 60–61 (2d Cir. 1995) (noting, in the criminal context, that "the prescribed procedure for resolving [a] dispute [as to whether certain confidential documents are subject to discovery] is to provide the documents to the district court for *in camera* review" and that "[t]he district court normally returns such documents to the party that submitted them *in camera* ")).

result in the improper disclosure of information that, by its very nature, may put the national security of the United States at risk.[19]

Here, notwithstanding the District Court's authority to review the CIPA filings without comment by Al-Farekh, the District Court met *ex parte* with defense counsel so that counsel could present Al-Farekh's theory of the case and his potential defenses. Following this meeting, the District Court reviewed the classified information in the Government's CIPA materials to determine whether it was helpful or material to Al-Farekh's defense and whether the Government's proposed summary substitutions were adequate to guarantee Al-Farekh a fair trial. The Government even revised some of its proposed substitutions after meeting with the District Court and before the District Court approved them.

Far from abusing its discretion, the District Court properly exercised its authority under CIPA when it reviewed and adjudicated the Government's CIPA motions *ex parte* and *in camera*. We find no basis in CIPA for vacating Al-Farekh's conviction.

---

[19] Persons with an appropriate security clearance still may not have access to classified information if they do not have a "need to know" that information. *See* Exec. Order No. 13526, §§ 4.1(a), 6.1(dd), 75 Fed. Reg. 707, 720, 728–29 (Dec. 29, 2009) (internal hyphenation omitted). A defense counsel does not "need to know" classified information that is neither helpful nor material to the defense of his or her client. *See United States v. Libby*, 429 F. Supp. 2d 18, 24 & n.8 (D.D.C. 2006) ("It is axiomatic that even if the defendant and his attorneys had been granted the highest level of security clearances, that fact alone would not entitle them to access to every piece of classified information this country possesses."), *as amended*, 429 F. Supp. 2d 46 (D.D.C. 2006).

## B. Murad's Out-of-Court Photo Identification of Al-Farekh

Al-Farekh also contends that the District Court denied him his due process rights under the Fifth Amendment when it denied his motion to exclude Sufwan Murad's out-of-court photo identification of Al-Farekh as the man Murad knew as "Abdullah al-Shami, external operations official of Al-Qaeda."[20] Specifically, Al-Farekh argues that the photo identification should have been suppressed as the product of an unduly suggestive identification procedure. We review the District Court's admission of identification evidence for clear error,[21] overturning its "findings as to what procedures were used . . . only if clearly erroneous" and giving due "deference" to its "assessment of the credibility of the witness[ ]."[22]

Murad, a former al-Qaeda collaborator, testified at his Rule 15 deposition that he saw a person he knew as Abdullah al-Shami on two separate occasions while driving al-Qaeda leader Haji Mohammed to deliver stipends to members of al-Shami's al-Qaeda brigade. ██████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[20] Appellant's App'x ("App'x") at 112.

[21] *See United States v. Ciak*, 102 F.3d 38, 42 (2d Cir. 1996) (citing *United States v. Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1992)).

[22] *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994).

██████████████████████████████.[23] ███████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████[24]

███████████████████████████████████████, authorities in Murad's "home country"[25] again interrogated him ████████ ████████████████████████████. During that interrogation, Murad mentioned al-Shami and provided a detailed description of al-Shami's physical appearance. Murad then worked with a sketch artist to create a computer sketch of al-Shami. Murad testified that he "would give [the sketch] about 80 percent accuracy."[26]

████████████████████████████████████████████████████████████ ████████████████████████████████████.[27] In his home country, interrogators showed Murad approximately 300 photographs and asked him to identify the person in each picture. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[23] Sealed App'x at 14–15.

[24] *Id.* at 15.

[25] Because Murad's country of residence is sensitive information that was filed under seal, we will refer to it as "home country" throughout this opinion.

[26] App'x at 108.

[27] Sealed App'x at 16.

███████████████████████████████████████████████

███████████████████████████████████████[28]

In his home country, Murad identified one photograph of Al-Farekh *after* providing his description of al-Shami and helping to compose the sketch. Murad expressed the view that he had "100 percent" confidence in his identification.[29] At the time of the identification in his home country, Murad wrote a statement on the back of the photograph depicting Al-Farekh, the person Murad knew as "Abdullah al-Shami, external operations official of Al-Qaeda."[30] At his deposition much later, Murad provided a description of al-Shami's appearance that is substantially similar to the one he testified he had provided to the authorities in his home country, and also identified the same photograph of Al-Farekh.

In reviewing Al-Farekh's due process challenge to the admission of Murad's identification, we must first ask whether the identification procedures employed overseas were "unduly

---

[28] *Id.*

[29] App'x at 112.

[30] *Id.* at 112. At his deposition, Murad testified that he could not remember if the ███████ authorities had shown him that specific photograph, but that he was sure that the authorities in his home country had shown it to him after composing the sketch. Murad also was shown four other photographs of Al-Farekh, but was not able to identify them. Unlike the photograph of Al-Farekh that Murad *did* identify, the other four photographs depicted Al-Farekh at a different time of his life and with a significantly different physical appearance.

suggestive of the suspect's guilt."[31] In conducting this threshold inquiry, we must "examine the procedures employed in light of the particular facts of the case and the totality of the surrounding circumstances."[32] If the procedures were not unduly suggestive, "the trial identification testimony"—here, Murad's testimony at his Rule 15 deposition—"is generally admissible without further inquiry into the reliability of the [out-of-court,] pretrial identification."[33] That is so because, where there is no possible taint of suggestiveness in the identification procedures, "any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility."[34]

If the identification procedures were unduly suggestive, then we must consider whether the "in-court identification" is "independently reliable rather than the product of the earlier suggestive procedures."[35] An identification that is independently reliable could still be admissible, "although a strongly suggestive pre-

---

[31] *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

[32] *Thai*, 29 F.3d at 808 (citing *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992); *Maldonado-Rivera*, 922 F.2d at 973).

[33] *Maldonado-Rivera*, 922 F.2d at 973.

[34] *Id.* (citing *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986)).

[35] *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Sims v. Sullivan*, 867 F.2d 142, 145 (2d Cir. 1989); *Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir. 1982)). Here, the in-court identification consists of Murad's testimony at his Rule 15 deposition, which was admitted into evidence at trial.

trial identification procedure necessarily makes it difficult for the reviewing court to find such independent reliability."[36]

With this background in mind, we turn to the first step of our inquiry—whether the identification procedures employed by foreign governments during Murad's interrogation were unduly suggestive. A review of our caselaw suggests that identification procedures are unduly suggestive when they involve coercive elements employed to elicit a specific identification. As we have noted in the context of photographic presentations, "[t]he [photo] array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator."[37] For example, it could be unduly suggestive if there is a "display" of "only the picture of a single individual who generally resembles the person [the witness] saw, or . . . the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."[38]

In *United States v. Fernandez*, we held that the use of a six-photo array where only one of the six persons depicted in the photographs

---

[36] *Ciak*, 102 F.3d at 42 (citing *Dickerson*, 692 F.2d at 247). In conducting this second-step inquiry into whether an identification is independently reliable, a court must consider the following factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

[37] *Maldonado-Rivera*, 922 F.2d at 974.

[38] *Simmons v. United States*, 390 U.S. 377, 383 (1968).

even "remotely resemble[d]" the witness's description of the suspect was unduly suggestive.[39] Similarly, in *Dunnigan v. Keane*, we found that a photo array consisting of "more than 30 pictures of one individual using an ATM card, and no pictures of anyone else," was "highly suggestive."[40] And in *United States v. Ciak*, we noted that a witness's identification of a driver's license in the police officer's desk as that of the suspect-defendant was unduly suggestive because the police officer had previously identified a photograph of the defendant in front of the witness.[41]

To be sure, there is no bright-line rule that can be applied to determine whether an identification procedure is unduly suggestive. We have stated, however, that "a court must consider several factors, including the size of the [photo] array, the manner of presentation by the officers, and the contents of the array."[42] Thus, although not an exhaustive summary, we have found identification procedures to be unduly suggestive when they take at least one of three forms: (1) a very

---

[39] *United States v. Fernandez*, 456 F.2d 638, 641–42 (2d Cir. 1972). Notably, we also noted in dictum that if there had been an 11-photo array with two photographs depicting the person who matched the witness's physical description, the identification procedure would have been permissible. *See id.*

[40] *Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 1998), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012).

[41] *Ciak*, 102 F.3d at 42 (noting that "the Government concedes, *as it must*, that [the police] employed unduly suggestive pre-trial procedures with [the witness]" (emphasis added)).

[42] *Thai*, 29 F.3d at 808 (citing *Concepcion*, 983 F.2d at 377; *Maldonado-Rivera*, 922 F.2d at 974).

small number of photographs, which are in turn presented in a manner that suggests to the witness that a specific person may be the suspect (as in *Fernandez*); (2) a large number of photographs depicting the same person (as in *Dunnigan*); or (3) the utterance of suggestive comments by interrogators to the witness to obtain an identification that is jointly constructed by supplying the witness with previously unknown facts about the suspect (as in *Ciak*).

By contrast, where, as here, there is a large display of photos arranged in no particular order or format, and the interrogators do not intimate which picture the witness should identify, the identification procedure is not impermissibly suggestive.[43] Specifically, we have held that an array of more than 50 photographs depicting men of the same ethnicity, who appeared to be of the same age and had similar hair color, was not unduly suggestive.[44] We have also held that an array of nine, or even as few as six, photographs was not so small as to suggest the identification of the suspect, where "several of the persons depicted met [the witness's] description of [the suspect], and

---

[43] *See, e.g., id.* at 810 ("Although repeatedly asking a witness who has selected a certain photo to look again at the array might be troubling in some circumstances, for example if there were a small number of photos and only one perpetrator, the procedure described here, given the large number of photos in the array and the large number of robbers, was not impermissible."); *United States ex rel. Gibbs v. Vincent*, 524 F.2d 634, 637–39 (2d Cir. 1975) (concluding that a procedure involving the display of several hundreds of photographs to witnesses of an armed robbery was appropriate).

[44] *See Thai*, 29 F.3d at 809.

there was no feature of [the suspect's] photo that made his stand out from all the rest."[45]

On review of the record before us, we conclude that the procedures that resulted in Murad's identification of Al-Farekh were not unduly suggestive.

The totality of the circumstances surrounding the identification of Al-Farekh's photograph in Murad's home country confirm that the identification procedures were not employed to elicit a positive identification of Al-Farekh. To the contrary, Murad was shown approximately 300 photographs and was asked to identify the persons depicted in each photograph as part of the home country's counterterrorism efforts. Out of the 300 photographs that were shown to Murad, only five—each of them different—depicted Al-Farekh.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████ Finally, Murad provided a detailed description of Al-Farekh's physical appearance and assisted in the creation of a

---

[45] *Maldonado-Rivera*, 922 F.2d at 974–75 (involving a witness's description of a suspect "as a Puerto Rican man in his 30's who had a small stature, was balding or losing some of his hair, and had a small beard," as well as an array of nine photographs depicting persons whose ethnicity was "indeterminate, and the majority may well be Hispanic," "[a]ll but one or two of the subjects appear to be in their 30's," "[a]ll nine have a small amount of facial hair," and "[t]wo appear to be balding, and two others have hairlines that may be receding"); *see, e.g., United States v. Archibald*, 734 F.2d 938, 940–41 (2d Cir. 1984) (upholding a six-photo array); *United States v. Marrero*, 705 F.2d 652, 655 n.5 (2d Cir. 1983) (same); *United States v. Bennett*, 409 F.2d 888, 898 (2d Cir. 1969) (same).

computer sketch *before* he was shown the photograph of Al-Farekh that he identified out of the array.

Unsurprisingly, Al-Farekh does not argue that the identification procedures in Murad's home country were unduly suggestive. Instead, Al-Farekh's challenge is premised on the unsupported assertion that Murad was in fact shown Al-Farekh's photograph while Murad was in ████ custody and was subjected to an interrogation that Murad described as ████████████████████████ [46] According to Al-Farekh, because Murad was shown the photograph in a ████ environment in ████ before it was shown to him by officials in his home country, the circumstances surrounding the identification were unduly suggestive and rendered the identification unreliable. But there is no evidence that Murad was in fact shown the photograph by the ████ authorities. Murad testified that, although possible, he had no memory of that.

Even assuming, for the sake of argument, that Murad were shown Al-Farekh's photograph in ████, there is no basis in the record to conclude that the procedures of the ████ authorities were unduly suggestive. Murad did testify that the interrogation was ████████████████████████ [47] but he did so only in terms of the disorganization of the photo array and interrogation. The photo array was in no way unfair or prejudicial to Al-Farekh, who has not pointed to any evidence in the record suggesting, much less showing,

---

[46] Sealed App'x at 15.

[47] *Id*.

26

that there were suggestive comments uttered during the interrogation or any other attempts to influence Murad's identification of Al-Farekh.

████████████████████████████████████████████

████████████████████████████████████████████

█████████████

Finally, Al-Farekh argues that the identification is unreliable because there are some inconsistencies in Murad's testimony relating to when Murad first saw the photograph of Al-Farekh that Murad identified as depicting the person that he knew as al-Shami. That may be so. But none of those arguable inconsistencies relate to the potential suggestiveness of the identification procedures that resulted in the challenged identification. Any remaining "question as to the reliability of [Murad's] identifications [of Al-Farekh] goes to the weight of the evidence, not its admissibility."[48]

In sum, we find no error, let alone "clear error," in the admission of Murad's photo identification and his related testimony.

## C. The Cross-Examination of Fingerprint Examiners in Light of the Brandon Mayfield Incident

The evidence against Al-Farekh included the testimony of an FBI fingerprint examiner, Kendra Sibley, who concluded that 18 latent prints recovered from the adhesive packing tape in the undetonated VBIED matched Al-Farekh's fingerprints. Al-Farekh argues that the District Court erroneously precluded him from properly cross-

---

[48] *Maldonado-Rivera*, 922 F.2d at 973 (citing *Jarrett*, 802 F.2d at 42).

examining Sibley. Specifically, Al-Farekh challenges the District Court's exclusion of evidence relating to the Brandon Mayfield incident of May 2004, where FBI examiners examined one latent print in connection with a terrorist attack on the commuter trains in Madrid, Spain, and erroneously identified the fingerprint to be that of Mayfield, a U.S. citizen residing in Oregon.[49]

Relying on its discretionary authority under Federal Rule of Evidence 403,[50] the District Court prevented Al-Farekh from cross-examining Sibley about the Mayfield incident on the basis that the potential for confusion and undue prejudice greatly exceeded whatever probative value the reference to Mayfield's case might have. Al-Farekh contends that the District Court's limitation on his cross-examination of Sibley violated his constitutional right to present a defense grounded in either the Fifth Amendment's Due Process Clause[51] or the Sixth Amendment's Confrontation Clause[52] because it

---

[49] *See supra* note 2.

[50] Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

[51] The Fifth Amendment's Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V.

[52] The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI.

prevented him from properly undermining the reliability of Sibley's testimony and the fingerprint examination in this case.

Generally, we review for an abuse of discretion a judge's limitation on the scope of a defendant's cross-examination.[53] "To find such abuse, we must conclude that the trial judge's evidentiary ruling[ ] [was] arbitrary and irrational."[54] But when the limitation directly implicates a defendant's constitutional right, such as his rights under the Confrontation Clause, we review that evidentiary ruling *de novo*.[55] "Even if error is found, 'a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.'"[56]

The Confrontation Clause protects a criminal defendant's right to cross-examine witnesses.[57] An undue limitation on cross-examination may violate the Sixth Amendment's Confrontation Clause if it prevents the defendant from, among other things, exposing a witness's biases, motivation, or incentives for lying, or eliciting testimony that is relevant and material to the defense.[58]

---

[53] *See United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012) (citing *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008)).

[54] *Id.* (quoting *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006) (quotation marks omitted)).

[55] *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006) (citations omitted).

[56] *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

[57] *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).

[58] *See id.* at 51–52.

This is not to say, however, that the defendant has the unbridled prerogative of cross-examining witnesses about any topic, or in the manner that the defendant wishes. For example, once a defendant is able to impeach the witness's credibility, the extent to which the defendant is able "to hammer that point home to the jury" is "of peripheral concern to the Sixth Amendment."[59] Trial judges have broad discretion to limit the cross-examination of witnesses as appropriate to minimize the risk of harassment, undue prejudice, confusion of issues to be presented to the jury, redundancy of the evidence, or unnecessary delays in the trial.[60] We have thus recognized that district courts have an independent "responsibility to [e]nsure that issues are clearly presented to the jury"[61] by, for example, imposing reasonable limitations on cross-examination.[62]

The District Court's limitation on the cross-examination of Sibley does not run afoul of Al-Farekh's rights under the

---

[59] *United States v. Groce*, 891 F.3d 260, 267 (7th Cir. 2018) (citations and quotations omitted); *accord Vitale*, 459 F.3d at 195–96.

[60] *See Van Arsdall*, 475 U.S. at 679 (noting that district courts have "wide latitude . . . to impose reasonable limits . . . on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant").

[61] *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985) (citing *United States v. Vega*, 589 F.2d 1147, 1152 (2d Cir. 1978)); *see also* Fed. R. Evid. 403 (authorizing the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury").

[62] *See, e.g.*, *Vitale*, 459 F.3d at 195; *United States v. Sasso*, 59 F.3d 341, 347 (2d Cir. 1995).

Confrontation Clause. *First*, the misidentification of Mayfield is only marginally relevant to the Government's case against Al-Farekh. The fingerprint examiners in the Mayfield incident were not involved in the instant case. And the Mayfield case involved only one print that was examined 16 years before the trial of Al-Farekh, whereas 18 latent prints were recovered from the undetonated VBIED and examined in this case.

*Second*, the District Court did not preclude Al-Farekh from highlighting the possible subjectivity of, and potential flaws in, fingerprint evidence through his cross-examination of Sibley. To the contrary, Al-Farekh had the opportunity to do just that. Sibley testified, for example, about the "level of subjectivity in latent print comparisons" and about the potential for mistakes by examiners in making false positive identifications.[63] Other than being unable to rely on the Mayfield case and the report of the Department of Justice's Office of Inspector General prepared *on that case*, Al-Farekh was free to attack Sibley's methodology and fingerprint examinations as a type of evidence.

There are many types of evidence whose reliability and objectivity could be probed through effective cross-examination. By relying on scientific literature, expert testimony, or common-sense experiences, a defendant may highlight the reliability concerns that are sometimes associated with, for example, eyewitness identifications or

---

[63] Gov't App'x at 61.

confessions elicited by police interrogations.[64] In doing so, however, trial judges rarely, if ever, allow defendants to rely on the facts of wholly unrelated cases to make their point. A ruling of that sort might confuse jurors.

Fingerprint evidence is no different. Here, the District Court's limitation on the cross-examination of Sibley is consistent with the understanding that a defendant may attack the subjectivity of fingerprint examinations as a category of evidence, but is not entitled without more to rely on a fingerprint examiner's mistakes in a wholly unrelated case to undermine the testimony of a different examiner.[65]

---

[64] To be clear, the availability of cross-examination as a tool to probe the reliability of evidence does not eliminate the trial judge's obligation to determine the admissibility of the evidence in the first instance, particularly where the defendant's constitutional rights are implicated. As discussed above, judges have an independent obligation to determine if, for example, an out-of-court identification is the result of unduly suggestive procedures, or if the coercion inherent in custodial interrogations has resulted in an involuntary confession that should be excluded.

[65] *See, e.g.*, *United States v. Bonds*, 922 F.3d 343, 344, 346 (7th Cir. 2019) (holding that the exclusion of evidence relating to the Mayfield incident during the cross-examination of an FBI examiner who worked "in the same FBI division that mistakenly identified Mayfield" was appropriate because, among other things, "[g]uilt by association would be a poor reason to deny a district judge the discretion otherwise available under Fed. R. Evid. 403"); *United States v. Rivas*, 831 F.3d 931, 935 (7th Cir. 2016) (holding that "there was no Sixth Amendment violation (or abuse of discretion, to the extent [the defendant] argues it)" in the district court's limitation on the cross-examination of the fingerprint examiner because the examiner "was not the person who conducted the analysis in the Mayfield case[,] . . . was not involved in the Mayfield case in any way, and the separate Mayfield case has no relationship to this case").

Since the examiners in the Mayfield case bear no relation to the examiners in Al-Farekh's case, we see no error in the District Court's conclusion that marginally relevant evidence relating to a separate case with no factual connection to Al-Farekh might confuse the jury and, therefore, should be excluded.

### III. CONCLUSION

To summarize, we hold that:

(1) The District Court's *ex parte*, *in camera* adjudication of motions filed pursuant to § 4 of the Classified Information Procedures Act ("CIPA") fell squarely within the authority granted by Congress. The District Court therefore properly exercised its authority under CIPA when it reviewed and adjudicated the Government's CIPA motions *ex parte* and *in camera*, notwithstanding defense counsel's security clearance.

(2) The totality of the circumstances surrounding the identification of Al-Farekh's photograph—where he was shown hundreds of photographs arranged in no particular manner and where the interrogators did not utter prejudicial comments on the identification—were not unduly suggestive. Accordingly, the District Court did not err in admitting the out-of-court photo identification of Al-Farekh.

(3) The District Court acted well within its discretion in limiting Al-Farekh's cross-examination of the Government's

fingerprint examiner to exclude references to the incident concerning Brandon Mayfield 16 years earlier because the fingerprint examiner here was not involved in the analysis in that earlier case that resulted in the misidentification of Mayfield's fingerprint.

For the foregoing reasons, the District Court's judgment is **AFFIRMED**.