20-30-cr (L)
*United States v. Gershman*

# United States Court of Appeals
# for the Second Circuit

August Term, 2021

(Argued: October 7, 2021     Decided: April 12, 2022)

Docket Nos. 20-30 (L), 20-754 (Con)

———————————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

LEONID GERSHMAN, aka Lenny, aka Lenny G, aka Lyonchik, aka Lyonya,
ALEKSEY TSVETKOV, aka Pelmin, aka Lesha, aka Lyosha,

*Defendants-Appellants*,

Viktor Zelinger, AKA Vitya, AKA Vityok, Renat Yusufov, AKA Ronnie, AKA
Ronik, Igor Krugly, Vyacheslav Malkeyev, AKA Steve Bart, Isok
Aronov, Yusif Pardilov, AKA Yosik, Librado Rivera, AKA Macho,
AKA Max, Eric Bobritsky, AKA Mamaz Boy, Artiom Pocinoc,

*Defendants.*

———————————————————

Before:

JACOBS AND MENASHI, *CIRCUIT JUDGES*, AND CRONAN, *DISTRICT JUDGE*[*]

A jury convicted Defendants-Appellants Leonid Gershman and Aleksey
Tsvetkov of a slew of offenses for their role in a Brooklyn-based crime syndicate.

———————————————

[*] Judge John P. Cronan, of the United States District Court for the Southern
District of New York, sitting by designation.

They now appeal their convictions and sentences. Because we find that their challenges lack merit, the District Court's judgment is **AFFIRMED**.

Judge Jacobs concurs in part and dissents in part in a separate opinion.

Kevin Trowel (Andrey Spektor and Mark J. Lesko, *on the brief*), Assistant United States Attorney, *for* Breon Peace, United States Attorney for the Eastern District of New York, *for Appellee.*

Steven Yurowitz, Newman & Greenberg LLP, *for Defendant-Appellant Leonid Gershman.*

Murray Singer, Murray E. Singer, Esq., *for Defendant-Appellant Aleksey Tsvetkov.*

CRONAN, *District Judge*:

This appeal involves the convictions of two members of a Brooklyn-based crime syndicate. Like a well-run business, the syndicate diversified its activities: arson, extortion, illegal gambling, marijuana distribution, firearms trafficking, and wire fraud. After several members of the syndicate pleaded guilty, two members, Appellants Leonid Gershman and Aleksey Tsvetkov, proceeded to trial. Following a three-week trial, a jury convicted Gershman and Tsvetkov of numerous crimes, including racketeering offenses. Each man was sentenced principally to 198 months' imprisonment. Gershman and Tsvetkov now appeal

their convictions, raising a host of arguments to include challenges to the admissibility of certain trial testimony, the correctness of the jury charge, the sufficiency of the Government's proof, and the lawfulness of their sentences. Because we find that all their challenges lack merit, we affirm their convictions and sentences.

## I. BACKGROUND[1]

### A. Illegal Gambling

The gambling crimes began in early 2016. At that time, Gershman, Tsvetkov, and Renat Yusufov began hosting weekly high-stakes poker games at a building off McDonald Avenue in Brooklyn, New York ("McDonald Avenue Poker Spot"). The McDonald Avenue Poker Spot was short-lived, however, thanks to a police raid just over a month after the games began.

Undeterred, Gershman, Tsvetkov, and Yusufov swiftly moved their gambling operation to another building off Coney Island Avenue ("Coney Island Poker Spot"), adding three new partners: Viktor Zelinger, Igor Krugly, and Vyacheslav Malkeyev. To avoid suspicion, the group disguised the building to

---

[1] Because this appeal follows convictions after a jury trial, the following factual recitation is drawn from the evidence adduced at trial, presented in the light most favorable to the Government. *See United States v. Litwok*, 678 F.3d 208, 210-11 (2d Cir. 2012).

make it appear to house a leasing and security company. But the inside of the Coney Island Poker Spot looked quite different. It had all the amenities needed for an illegal gambling operation: a poker room, a video poker machine, a players' lounge, and a kitchen.

During the bi-weekly sessions, the players would wager hundreds of thousands of dollars, with the partners taking a cut of those wagers. That rake yielded a hefty profit of about $20,000 per session. The gamblers at the Coney Island Poker Spot did not immediately exchange cash with the syndicate members during the games. Rather than playing cash games, players gambled using house credit, with their wins and losses recorded in ledgers. And the gamblers were to either collect their winnings or pay their losses the next week.

This credit system came with problems, however, as unsuccessful gamblers did not always pay their debts on time or in full. So over time, the collection tactics became less friendly. For instance, Gershman recruited members of the Eastern European mafia to confront one gambler and his family in Russia and Israel. Nor was the group reluctant to resort to threats of violence to pressure defaulting gamblers: they threatened to "smash [one gambler's] f***ing face," told another gambler that the debt pay-by dates were "not [just] words," and advised another

gambler that if he did not pay, they would not "all be living peacefully anymore." Gov't App'x 75-76, 88, 96-97. And when Gershman began to suspect that one gambler cheated when playing at the Coney Island Poker Spot, Gershman slapped and drop-kicked the person who he suspected invited the cheater to the game.

The syndicate employed even more violent means to protect the Coney Island Poker Spot from competition. In April 2016, Gershman and his partners began to believe that a nearby poker spot on Voorhies Avenue ("Voorhies Avenue Poker Spot") was hurting their business. Gershman, Tsvetkov, and two other syndicate members met with the man who ran the Voorhies Avenue Poker Spot to discuss how to resolve their issues. Discussions went nowhere.

So Gershman, Tsvetkov, Zelinger, Yusufov, and Malkeyev met at the Coney Island Poker Spot to decide how to deal with this problem. Before starting the meeting, Gershman asked everyone to turn off their phones. Zelinger then proposed setting the Voorhies Avenue Poker Spot on fire, a solution to which everyone agreed. After Tsvetkov asked who would set the fire, Zelinger directed Yusufov and Malkeyev to do it.

And so in early May 2016, Yusufov and Malkeyev drove to the Voorhies Avenue Poker Spot to commit the arson. They broke in with a crowbar, doused

the poker room with lighter fluid, and then set the room on fire. The fire spread to the second and third floors, nearly killing a 19-year-old man and his 12-year-old brother and seriously injuring a firefighter who responded to the blaze.

## B.      Other Extortions

People also came to Gershman and Tsvetkov for assistance in collecting non-gambling debts. Gershman and Tsvetkov would oblige, extorting victims with threats and violence to collect debts.

For example, Gershman punched a debtor named Denis Dulevskiy in the face, threatening Dulevskiy that he would "break [his] f***ing mouth" and that Dulevskiy would end up worse than his mother, who was hospitalized at the time. *Id.* at 62. Tsvetkov punched another debtor in the face after Tsvetkov, Gershman, and Yusufov met the man in an alley. Gershman put a blade to another man's face and told Yusufov that they "should . . . give [the man] a 150" (a threat to cut across the man's face so that he would require 150 stitches). App'x 464-65. And Tsvetkov took a gold chain off another man's neck and later beat the man, including kicking him three times while he lay helpless in the middle of the street.

**C.      Marijuana Trafficking**

Syndicate members also ran an illegal marijuana distribution business. Gershman began the business with Malkeyev and Eric Bobritsky in 2010 or 2011. Gershman and Malkeyev operated the business at the high level: purchasing marijuana from wholesalers, hiring and firing drug runners, and keeping track of the books. To maximize profits, Gershman and Malkeyev would buy marijuana from different suppliers depending on who was offering the best price and quality. Tsvetkov was one of the top suppliers for the business.

To sell the product, Malkeyev would bag the marijuana for retail sale and Bobritsky would then deliver it to buyers. Gershman and Malkeyev also employed drug runners to distribute the marijuana, paying these runners around $40,000 per year and supplying them with cars equipped with secret compartments to store marijuana and cash. All these efforts led to a lucrative business: Gershman, Malkeyev, and Bobritsky each made around $5,000 per month.

Because the marijuana business was so profitable, Gershman, Malkeyev, and Bobritsky protected it with violence. After discovering that two members of a rival criminal organization stole cash and marijuana from their stash house,

Gershman set up a meeting with one of the suspected thieves, Misha Arazyev. Gershman, Tsvetkov, and Malkeyev then met Arazyev on a busy street in Brooklyn. When the conversation between Gershman and Arazyev went south, Gershman hit Arazyev and Malkeyev pulled out a pistol and pointed it at Arazyev. Arazyev tried to run away, but Gershman, Tsvetkov, and Malkeyev chased him down, with Tsvetkov directing Malkeyev to shoot (which Malkeyev did not do). When they caught Arazyev, Gershman and Tsvetkov beat Arazyev, and Tsvetkov then repeatedly pistol-whipped him with Malkeyev's gun.

Besides profits and violence, the marijuana business was a venture involving close friends—Gershman considered Bobritsky and Malkeyev "family." *Id.* at 1561. And so when someone caused (in Gershman's mind) issues between the three men, Gershman did not take kindly to it. A long-time cocaine dealer, Leonid Kotovnikov, gossiped about tension among Gershman, Malkeyev, and Bobritsky over pay. Gershman swiftly extorted Kotovnikov for $10,000 for "mess[ing] up his family" by telling Kotovnikov that he knew where he lived and where his wife slept and that Kotovnikov "didn't want any altercations with him." *Id.* at 1560-61. Gershman also extorted Kotovnikov for money when Kotovnikov briefly hired Bobritsky to work for his cocaine business.

## D. Other Crimes

Gershman and Tsvetkov committed other crimes as well. Gershman ran a highly profitable loansharking business. He also supplied firearms to the syndicate. And Tsvetkov defrauded Progressive Insurance by using Yusufov and a business partner to inflate the damages to his car.

## E. Convictions and Sentences

Appellants and seven other individuals were arrested in November 2016 on a ten-count indictment. Over the next year-and-a-half, the Government superseded the original indictment four times, culminating in a twenty-six-count indictment (the "Indictment") in May 2018. The Indictment charged racketeering and a racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), extortionate collection of credit, extortion, illegal gambling, firearms offenses, marijuana distribution, and a wire fraud conspiracy.

The trial began on August 7, 2018. The Government called sixteen witnesses, including Yusufov and Malkeyev who testified with cooperation agreements with the Government. The defense called three witnesses, including workers at the Coney Island Poker Spot and the Voorhies Avenue Poker Spot.

After a three-week trial, the jury convicted Gershman and Tsvetkov on all Counts. In its verdict, the jury also found that the Government had proven all fifteen racketeering acts alleged in the Indictment. In short, the jury convicted Appellants of:

| Count(s) | Charge | Defendant(s) |
|---|---|---|
| 1 | Racketeering | Gershman and Tsvetkov |
| 2 | Racketeering conspiracy (collection of unlawful debt) | Gershman and Tsvetkov |
| 3 | Extortionate collection of credit conspiracy | Gershman and Tsvetkov |
| 4-5 | Extortion and related conspiracy | Gershman and Tsvetkov |
| 6-14 | Extortion and related conspiracy | Gershman |
| 15-16 | Illegal gambling and related conspiracy | Gershman and Tsvetkov |
| 17-18 | Arson at 2220 Voorhies Avenue and related conspiracy | Gershman and Tsvetkov |
| 19-20 | Marijuana distribution and related conspiracy | Gershman and Tsvetkov |
| 22-23[2] | Firearms trafficking | Gershman |
| 24-25 | Extortionate extension of credit | Gershman |
| 26 | Wire fraud conspiracy | Tsvetkov |

[2] The jury also convicted Gershman and Tsvetkov of Count 21, which charged them with unlawfully using and brandishing a firearm. The District Court vacated these convictions after trial, without objection from the Government.

For the substantive racketeering charge, the jury found that the Government had proven each racketeering act:

| Racketeering Act(s) | Charge | Defendant(s) |
|---|---|---|
| 1-2 | Extortionate collection of credit and state law extortion | Gershman and Tsvetkov |
| 3-6 | Extortionate collection of credit and state law extortion | Gershman |
| 8-9 | Hobbs Act extortion and state law extortion | Gershman |
| 10 | State law extortion | Gershman and Tsvetkov |
| 11 | State law extortion | Gershman |
| 12 | Attempted state law extortion | Tsvetkov |
| 13 | Arson and related conspiracy | Gershman and Tsvetkov |
| 14 | Extortionate extension of credit and related conspiracy | Gershman |
| 15 | Illegal gambling | Gershman and Tsvetkov |
| 16 | Distributing marijuana and related conspiracy | Gershman and Tsvetkov |

On December 3, 2019, the District Court sentenced Gershman to 198 months' imprisonment, to be followed by five years of supervised release, and on February 20, 2020, the District Court also sentenced Tsvetkov to 198 months' imprisonment, to be followed by three years of supervised release.  This appeal follows.

## II.  CHALLENGES TO THE CONVICTIONS

We start with Appellants' challenges to their convictions.  Gershman alone argues that the District Court improperly permitted a witness to identify him at

trial without first conducting an evidentiary hearing, and that certain of his convictions for extortionate collection of credit conspiracies violated the Fifth Amendment's Double Jeopardy Clause. Both Appellants challenge the sufficiency of the evidence supporting their RICO convictions, particularly as to whether an enterprise existed, and the sufficiency of the proof and the jury instructions for the arson-related charges. We take each challenge in turn.

## A.    Smoloff's Identification of Gershman

Gershman first challenges the District Court permitting Gershman's former neighbor, Todd Smoloff, to identify Gershman at trial as the person who likely possessed a firearm outside Smoloff's apartment building in September 2012. Smoloff testified that, after hearing a noise outside one day, he looked out his window to observe Gershman on a walkway pointing a black gun in the air.[3] Smoloff further explained to the jury that there appeared to be a dispute occurring at the time. The District Court admitted this testimony under Federal Rule of Evidence 404(b) as evidence of Gershman's access to guns during the relevant time period.

---

[3] To avoid undue prejudice, the District Court precluded the Government from eliciting testimony that Smoloff saw Gershman discharge the firearm.

Before identifying Gershman at trial, Smoloff had already met with the police concerning the September 2012 incident. First, in the immediate aftermath of the shooting, Smoloff told law enforcement that someone he recognized who lived on the sixth or seventh floor of his building, and who had a Russian accent, unique tattoos, and black-rimmed glasses, discharged a firearm outside the building during an incident with other people. Detectives then showed Smoloff approximately 600 photographs of individuals, none being Gershman, and Smoloff said that the perpetrator was not depicted in any of the photographs. Five years later, detectives showed Smoloff a six-photograph array, which included Gershman. Smoloff identified Gershman from the array and said that he was "virtually certain" that Gershman was the shooter.

Gershman argues that before allowing Smoloff's identification testimony, the District Court should have conducted an evidentiary hearing, known as a *Wade* hearing, to determine whether Smoloff's anticipated in-court identification of Gershman had been improperly tainted by these previous identification events. And by failing to conduct a *Wade* hearing, Gershman argues, the District Court improperly admitted Smoloff's in-court identification. Gershman contends that because this evidence was "critical" to the Government's proof as to his

13

commission of the gun trafficking offenses (*i.e.*, Counts 22 and 23), those two convictions must be vacated.

1. *Legal Standards*

The Supreme Court has recognized that due process can sometimes prevent a witness who identified a defendant before trial from identifying the defendant at trial. *See, e.g., Simmons v. United States*, 390 U.S. 377, 384-85 (1968); *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012). But those circumstances are scarce—"we will exclude a pre-trial identification only if it was *both* produced through an unnecessarily suggestive procedure *and* unreliable." *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994). So to exclude an in-trial identification based on a pretrial identification, a defendant must follow those two steps based on the "facts of [his] case and the totality of the surrounding circumstances." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

At step one, the Court must determine whether "the pretrial identification procedures were unduly suggestive of the suspect's guilt." *Id.* If the procedures were not unduly suggestive, then "the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification." *Id.* That is because when "there is no possible taint of

14

suggestiveness in the identification procedures, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility." *United States v. Al-Farekh*, 956 F.3d 99, 110 (2d Cir. 2020) (quotations omitted). But if the procedures were unduly suggestive, the analysis moves to the second step. There, "we must consider whether the in-court identification is independently reliable rather than the product of the earlier suggestive procedures." *Id.* (quotations omitted).

To determine whether a witness should be permitted to identify a defendant at trial, a defendant may request a pretrial evidentiary hearing under *United States v. Wade*, 388 U.S. 218, 239-243 (1967).[4] "The purpose of a *Wade* hearing is to

---

[4] At issue in *Wade* was the in-court identification of the defendant by two witnesses, following their viewing of a post-indictment lineup at which the defendant was not represented by counsel. The Supreme Court held that the post-indictment lineup was a critical stage of the prosecution, and therefore the Sixth Amendment provided the defendant the right to counsel at that lineup. *See* 388 U.S. at 237-38. In reaching this holding, the Court discussed the "innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial" that are attendant to witness identification of a defendant. *Id.* at 228. The Court also explained that "[i]nsofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him." *Id.* at 235 (citing *Pointer v. Texas*, 380 U.S. 400 (1965)). As to the remedy, the Court remanded for the district court to consider "whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error." *Id.* at 242.

determine before the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006), *as amended* (May 19, 2006) (quotations and alteration omitted).

"Where there is a contention that the pretrial identification was the result of impermissibly suggestive procedures, a *Wade* hearing is advisable; but the Supreme Court has made it clear that there is no '*per se* rule compelling such a hearing in every case.'" *Dunnigan v. Keane*, 137 F.3d 117, 128-29 (2d Cir. 1998) (quoting *Watkins v. Sowders*, 449 U.S. 341, 349 (1981)) (alterations omitted), *abrogated on other grounds by Perry*, 565 U.S. 228. That is because "the information needed for assessment of reliability can ordinarily be elicited through the time-honored process of cross-examination." *Id.* at 129 (quotations omitted). It is therefore the jury that should determine the reliability of identification evidence in all but the most extraordinary cases. *See United States v. Brewer*, 36 F.3d 266, 269 (2d Cir. 1994) ("[I]n the absence of a very substantial likelihood of irreparable misidentification, identification evidence is for the jury to weigh." (quotations and alterations omitted)).

In assessing whether Gershman was entitled to a *Wade* hearing under this framework, we employ a similar analysis as we do when assessing whether a defendant is entitled to an evidentiary hearing on a suppression motion, asking whether the defendant has shown that "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quotations omitted). Thus, a district court may decide the motion without a *Wade* hearing unless the defendant shows disputed issues of definite, specific, and nonconjectural material fact. *See United States v. Torres*, 191 F.3d 799, 811 (7th Cir. 1999) (adopting the same test for out-of-court identifications).[5]

Because the trial court has discretion as to whether to hold a *Wade* hearing, we review "the decision not to hold an evidentiary hearing for abuse of discretion." *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001). "We review a district court's determination of the admissibility of identification evidence for clear error." *Id.*

---

[5] District courts in the Second Circuit have also applied the general rule from *Pena* for deciding whether to conduct a *Wade* hearing. *See, e.g., United States v. Durant*, No. 18 Cr. 702 (CM), 2019 WL 2236233, at *3 (S.D.N.Y. May 15, 2019); *United States v. Collymore*, No. 16 Cr. 521 (CM), 2017 WL 5197287, at *2 (S.D.N.Y. Oct. 20, 2017); *United States v. Abu Ghayth*, 990 F. Supp. 2d 427, 434 (S.D.N.Y. 2014).

2. *Analysis*

We find that the District Court did not clearly err in permitting Smoloff to identify Gershman at trial nor abuse its discretion in denying Gershman's request for an evidentiary hearing. To begin with, Gershman failed to show that Smoloff's identification of Gershman from the six-photographic array—five years after the incident—arose from unduly suggestive procedures. "In evaluating whether or not a photographic array was unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array." *United States v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994); *see also id.* (collecting cases in which six-photograph array was found to be sufficiently large).

Gershman relies heavily on the fact that he was the only individual in the photograph array wearing a black hoodie. This is significant, he argues, because Smoloff first described the shooter on a 911 call shortly after the shooting as wearing a black hoodie, glasses, and shorts. Other individuals in the array, however, were depicted wearing similar clothing styles, including one person wearing a lighter colored hoodie and another wearing what appears to be a dark, collared jacket. Moreover, Gershman appeared in the photograph with various

features that differed markedly from how Smoloff described him shortly after the shooting: in the photograph, Gershman was not wearing glasses, had a different hairstyle, and had facial hair. And while some of the other individuals in the photograph array had similar facial hair as Gershman, at least two had noticeably less facial hair.

But even if there were any basis to conclude that the pretrial identification procedure was unduly suggestive, Gershman fails on the second step because of the independent reliability of Smoloff's in-court identification. Considerable indicia of reliability supported that identification. While the trial took place years after Smoloff witnessed the event, Smoloff had a clear view of Gershman from the safety of his apartment window, from where he surveyed the scene after hearing a gunshot; he saw Gershman's face, general build, and a tattoo on his arm; and he immediately recognized Gershman as a neighbor with whom he had ridden the elevator and conversed. When Smoloff identified Gershman in court, he did so with "100 percent" certainty. App'x 1307-08.

## B.   Extortion Conspiracy

We now turn to Gershman's argument that certain of his convictions for extortionate collection of credit conspiracies violated the Fifth Amendment's

Double Jeopardy Clause. The Double Jeopardy Clause protects against being tried twice for the same offense. This protection bars not only prosecutions for offenses that are literally the same but also prosecutions "when one offense is a lesser included offense of the other." *United States v. Gaskin*, 364 F.3d 438, 453 (2d Cir. 2004) (quotations omitted). The latter prohibition is at issue.

Gershman claims that some of his convictions for extortionate collection of credit conspiracies toward specific victims count as lesser offenses to his broader conviction for conspiracy to collect credit through extortionate means. Count 3 charged Gershman, Tsvetkov, and Zelinger with an overarching conspiracy from 2015 to November 2016 to collect credit through extortionate means. Gershman was also charged in Counts 4, 6, 8, 10, and 12 with shorter duration conspiracies to extort collecting credit from specific victims, John Does 1-5.[6] Gershman argues that Count 3, as the overarching conspiracy, subsumed Counts 4, 6, 8, 10, and 12, and therefore we should set aside his convictions for those five Counts.

"[T]he constitutional protection against double jeopardy is a personal right," *Aparicio v. Artuz*, 269 F.3d 78, 96 (2d Cir. 2001), and Gershman never raised

---

[6] Tsvetkov and Zelinger were also charged in Count 4. For Counts 6, 8, 10, and 12, Gershman was the only defendant charged.

this multiplicity challenge before the District Court. "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). This rule is not, however, "an absolute bar to raising new issues on appeal; the general rule is disregarded when we think it necessary to remedy an obvious injustice." *United States v. Stillwell*, 986 F.3d 196, 200 (2d Cir. 2021). So "[u]ltimately, 'entertaining issues raised for the first time on appeal is discretionary with the panel hearing the appeal.'" *Id* (quoting *Greene*, 13 F.3d at 586) (alteration omitted).

Here, the Government unsealed the second superseding indictment, which first charged all of the extortion conspiracies discussed above, almost a year before trial and the final superseding indictment was publicly filed about two-and-a-half months before trial. Any alleged defect in the charges therefore would have been apparent to Gershman well before trial. Under these circumstances, and given that the sentences run concurrently,[7] we do not find an obvious injustice in not reaching the claim. We thus decline to address Gershman's double jeopardy claim.

---

[7] We need not decide whether a double jeopardy violation in a case involving concurrent sentences, but lacking circumstances like those presented here, would create "an obvious injustice." *Stillwell*, 986 F.3d at 200.

## C.    Instructional and Sufficiency Challenges

We move next to Appellants' arguments that insufficient evidence supported their RICO and arson convictions, and that the jury instruction pertaining to the substantive arson offense was flawed.

### 1.    *Existence of a Racketeering Enterprise*

We review challenges to the sufficiency of the evidence *de novo*. *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017). But to reverse a conviction on appeal, a defendant carries a "heavy burden." *United States v. Demott*, 906 F.3d 231, 239 (2d Cir. 2018) (quotations omitted). To prevail, Appellants must show that "no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." *Id.* (quotations omitted). And in reviewing how a rational trier of fact would rule, "we must view the evidence in the light most favorable to the government." *Martoma*, 894 F.3d at 72 (quotations omitted). We thus "credit[] every inference that could have been drawn in the government's favor[] and defer[] to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* (quotations omitted).

With those principles in mind, we first turn to Appellants' challenges to their convictions for substantively violating RICO and conspiring to violate RICO,

as charged in Counts 1 and 2, respectively. Appellants contend that the Government offered insufficient proof that their criminal syndicate qualified as a RICO enterprise and therefore their convictions on Counts 1 and 2 must be vacated. We disagree.

As relevant here, RICO makes it unlawful for "any person employed by or associated with any enterprise" whose activities affect interstate or foreign commerce "to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity," or to conspire to do so. 18 U.S.C. § 1962(c), (d). Congress defined "enterprise" for purposes of RICO broadly. *See Boyle v. United States*, 556 U.S. 938, 944-46 (2009). An enterprise "includes any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Such a group has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Or to put it plainly, an association-in-fact enterprise is "simply a continuing unit that functions with a common purpose." *Id.* at 948.

Because of the expansive nature of an association-in-fact enterprise, it may help to think of the concept by what qualities are unnecessary. The group need

not have a name. *Id.* Nor must it "have a hierarchical structure or a 'chain of command.'" *Id.* Its members "need not have fixed roles." *Id.* And the group need not continually commit crimes—its associates may "engage in spurts of activity punctuated by periods of quiescence." *Id.*

The breadth of what encapsulates such an enterprise means that its existence "is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *United States v. Applins*, 637 F.3d 59, 73 (2d Cir. 2011) (quotations omitted). Thus, while the enterprise and pattern of racketeering activity are separate elements, "proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." *Id.* (quotations omitted); *see Boyle*, 556 U.S. at 947 (explaining that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce'" (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981))).

With that backdrop, the proof at trial, viewed in the light most favorable to the Government, established that Appellants' criminal syndicate qualified as an enterprise for purposes of RICO.

To start, there was considerable overlap in the individuals who committed the racketeering offenses. At least two criminal syndicate members committed eight of the nine extortions. And for the last extortion, which Tsvetkov committed alone, Tsvetkov immediately informed Gershman and another syndicate member right after he assaulted his victim, and further discussed with Gershman what he (Tsvetkov) had told the police. The syndicate members had broad involvements in the other crimes as well: most of the syndicate members took part in the illegal gambling, arson, and marijuana trafficking.

The dissent contends that there was "narrow" overlap between the gambling and marijuana operations. Dissent at 6. But the evidence shows otherwise. The gambling operation had six partners: Gershman, Tsvetkov, Krugly, Malkeyev, Yusufov, and Zelinger. Of those six partners, four also had roles in the marijuana distribution business. Gershman and Malkeyev ran that business. Tsvetkov served as one of the marijuana business's main suppliers. Yusufov created fake law enforcement paperwork to make it appear that a quantity of marijuana had been stolen, thereby allowing the business to keep that marijuana without having to pay for it. And when someone stole marijuana from

the business, Gershman asked Yusufov to arrange a meeting with the suspected thief, where that person was attacked by Gershman, Tsvetkov, and Malkeyev.

And even when a member did not directly take part in a particular crime, that member would often still lend a hand. For instance, Gershman helped Yusufov handle problems with Yusufov's cocaine business, serving as Yusufov's "go-to guy" and "muscle." App'x 459-60. This would include Gershman setting up meetings and committing acts of intimidation and violence for Yusufov.

Still further proof of the existence of an enterprise came from how syndicate members interacted with one another. Although lacking a formal structure or official titles, the syndicate still operated with a rough hierarchy in which certain individuals, like Gershman, Tsvetkov, and Yusufov, were above a drug runner like Bobritsky. And taking Bobritsky as an example, Yusufov was only able to bring in Bobritsky to work as a cocaine runner after securing permission to do so from Gershman. The planning of the arson of the Voorhies Avenue Poker Spot further reflected the hierarchical role of certain individuals, with Gershman directing others to turn off their phones and Tsvetkov asking who would burn down the spot, a job that ultimately was assigned to lower-level syndicate members.

The members also would share proceeds, with lower-level members often having no say in the cut they received. The dissent downplays the number of times when "alleged syndicate members were paid for loansharking referrals, help with an extortion, or some other odd job." Dissent at 10. Yet the evidence adduced at trial revealed that it was common for Gershman and others to share proceeds of their crimes with fellow syndicate members, including with lower-level members and ones who did not participate in the particular crime. Specific instances of such payments include: (1) Gershman paying syndicate member Artiom Pocinoc $1,500 for assisting in an extortion; (2) Gershman paying Malkeyev $1,000 for referring him to a loan shark customer; (3) Gershman paying Bobritsky $1,000 for helping extort Kotovnikov; (4) Gershman paying Bobritsky $50 to $100 each time he picked up loan money; (5) Malkeyev paying Bobritsky $50 to pick up loan money; (6) Gershman and Malkeyev paying Librado Rivera about $40,000 a year to be a drug runner; (7) Tsvetkov paying Yusufov $1,200 for helping to defraud Progressive Insurance; (8) Gershman, Malkeyev, and Bobritsky supposedly evenly sharing profits from the marijuana business, with Gershman and Malkeyev secretly taking a larger cut; and (9) Gershman sharing a cut from an extortion with Yusufov, even though Yusufov was not involved in that act.

In addition to these specific instances, the jury heard more general testimony that syndicate members routinely shared proceeds. Yusufov testified, for instance, that the members "were a group of friends," so they wanted to "make sure that everybody ate," and "everybody looked after one another." App'x 542. As Yusufov explained, when "people made money, . . . [the members] took care of each other." *Id.*

This evidence of sharing proceeds all tracked what the Indictment alleged: that the principal purpose of the enterprise was "to generate money for its members." Indictment ¶ 3. A rationale juror could look at the collective evidence showing that "a group of friends" who "took care of each other" and wanted to "make sure that everybody ate," App'x 542, was a syndicate that was created to generate money for its members. *See United States Eppolito*, 543 F.3d 25, 41, 57-58 (2d Cir. 2008) (finding sufficient evidence to show a RICO enterprise where the "principal purpose . . . was to generate money for its members and associates by means of various legal and illegal activities" even though "the nature of the services that were performed or attempted varied widely" (emphasis omitted)).

The syndicate's interaction with a rival crew further reinforces that it functioned as an enterprise. When Gershman, Tsvetkov, and Malkeyev attacked

a rival crew member, the rival crew retaliated by tailing a different syndicate member, Bobritsky. The fact that this rival crew decided to retaliate against a *different* syndicate member than the ones who attacked its member suggests that others viewed Appellants' group as "a continuing unit that function[ed] with a common purpose." *Boyle*, 556 U.S. at 948.

The dissent is critical of reading too much into this conflict with the rival crew, pointing out that the dispute started when the rival crew "stole from Gershman's marijuana business, and Bobritsky was the drug runner for that business." Dissent at 12 n.5. In the dissent's view, that the crew retaliated against Bobritsky merely "shows his affiliation with Gershman's marijuana business, not with some overarching organization." *Id*. But at this stage, we must review the trial evidence in the light most favorable to the Government. *See Martoma*, 894 F.3d at 72. Given that Bobritsky had no role in the attack that instigated the retaliation, a reasonable juror could easily conclude that the rival crew viewed Bobritsky as part of an overarching organization.[8]

---

[8] Assuming that Bobritsky was in fact targeted because the dispute centered on the marijuana business, that would only reinforce Tsvetkov's role in that part of the enterprise. After all, the altercation was triggered by Tsvetkov—along with Gershman and Malkeyev—attacking a member of that rival crew. Why would Tsvetkov agree to help attack someone over a dispute that only involved the marijuana business unless he too was part of that marijuana operation?

Many of Appellants' arguments urging a contrary result also simply provide different spins on the evidence. For instance, Gershman contends that he gave money to other members in the group not as payment for the crimes they committed but because he was being "generous with proceeds he received." Gershman Reply Br. 9-10. While that may be one explanation, a rational juror could instead infer that Gershman paid other members for their services to the enterprise.

In that same vein, Appellants contend that the evidence shows only that they "were small-time criminals" who at "times joined together" but never had "the structure or continuity necessary to establish an enterprise." Gershman Opening Br. 22 (quotations omitted); *see also* Tsvetkov Opening Br. 24-25. In their view, the group lacked continuity because the syndicate members changed over time. And, according to Appellants, the group lacked common goals because syndicate members committed "similar [criminal] activities" without other members participating and because the members had conflicts with each other. Tsvetkov Opening Br. 25.

But again, the jury need not have viewed the evidence that way. An enterprise "may continue to exist even though it undergoes changes in

30

membership." *Eppolito*, 543 F.3d at 49; *accord United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010). It therefore does not matter that, as Gershman notes, one of the top members, Zelinger, joined the syndicate after other members had already begun associating with each other. Nor do internal disputes or members committing outside crimes negate the existence of a RICO enterprise. *See, e.g.*, *United States v. Orena*, 32 F.3d 704, 710 (2d Cir. 1994); *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991). That makes sense. Criminal enterprises often endure infighting for money and power, and experience changes in their membership.

Appellate scrutiny of the sufficiency of the trial evidence of a criminal enterprise is not conducted in isolation. We instead review the collective proof, remaining "mindful that we consider the evidence presented in its totality." *United States v. Anderson*, 747 F.3d 51, 59 (2d Cir. 2014) (quotations omitted). Here, each piece of evidence may on its own have been too thin a thread to allow a rational jury to find a racketeering enterprise beyond a reasonable doubt. But the evidence weaved together to create a rope strong enough to hold the conviction. A rational juror could look collectively at the aforementioned evidence—(1) members having considerable shared involvement in committing many crimes, (2) the syndicate having a rough hierarchy, (3) members sharing proceeds from their

income-generating criminal activity including with members who were not involved in that particular activity, and (4) a rival crew retaliating against a member who had not targeted the rival—to find that the Government proved a racketeering enterprise beyond a reasonable doubt. We therefore affirm Appellants' RICO convictions and RICO conspiracy convictions.

2. *Arson and Arson Conspiracy Convictions*

Appellants also appeal their convictions for arson and conspiracy to commit arson, as charged in Counts 17 and 18. They challenge an aspect of the jury instruction on the substantive offense as well as the sufficiency of the proof for the conspiracy offense. We will start with the challenge to the jury charge.

"We review challenged jury instructions *de novo* but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Afriyie*, 929 F.3d 63, 67 (2d Cir. 2019) (quotations omitted). The defendant has the "burden to show prejudice." *Id.* "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* (quotations and alteration omitted).

Appellants first argue that the District Court erred by instructing the jury that it could find Appellants guilty of substantive arson as reasonably foreseeable

32

to the illegal gambling conspiracy, based on a theory of liability under *Pinkerton v. United States*, 328 U.S. 640 (1946). A *Pinkerton* charge "informs the jury that it may find a defendant guilty of a substantive offense that he did not personally commit if it was committed by a coconspirator in furtherance of the conspiracy, and if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement." *United States v. McCoy*, 995 F.3d 32, 63 (2d Cir. 2021). For a substantive offense taken by a coconspirator to be reasonably foreseeable, it must be "a necessary or natural consequence of the unlawful agreement." *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *Pinkerton*, 328 U.S. at 648).

Over Appellants' objections, the District Court instructed the jury that it could find Gershman or Tsvetkov guilty of substantive arson, as charged in Count 18, if it found that (1) the charged arson, *i.e.*, the arson at the Voorhies Avenue Poker Spot, was committed by a member of the arson conspiracy or the illegal gambling conspiracy, (2) the arson was committed pursuant to a common plan and understanding as part of that conspiracy, (3) the defendant was a member of the conspiracy when the arson was committed, and (4) the defendant could have reasonably foreseen that arson might be committed by his coconspirator. The District Court further defined an offense as being reasonably foreseeable "if it is a

natural or necessary consequence of the unlawful agreement." App'x 2098. This was a legally accurate *Pinkerton* instruction.

But in Appellants' view, the District Court erred in delivering this instruction because it was not reasonably foreseeable that the illegal gambling conspiracy would lead to the arson.[9] The trial testimony allowed the jury to conclude otherwise. Gershman and Tsvetkov were both at the meeting that planned the arson to protect their illegal gambling operation. At that meeting, Zelinger said that the Voorhies Avenue Poker Spot was a "problem" that "needed to [be] fix[ed]" because it competed with their nearby Coney Island Poker Spot. *Id.* at 583. The coconspirators then discussed several violent options to deal with this problem, including arson. And the arson plan was in fact adopted at this meeting, with two of the attendees identified as the arsonists. In other words, Gershman and Tsvetkov were both at (and in fact facilitated) a meeting where the attendees discussed how committing arson could "shut down" a competing gambling location and therefore help their own illegal gambling establishment, with the decision made to commit arson by the conclusion of the meeting. A

---

[9] Appellants objected to a *Pinkerton* charge as to the illegal gambling conspiracy only, not as to the arson conspiracy.

34

rational juror could therefore conclude that the arson was a "natural consequence of the" gambling conspiracy. *Pinkerton*, 328 U.S. at 648.[10]

Appellants resist this conclusion by arguing that the Government's description of reasonable foreseeability during its closing argument "compound[ed] the erroneous [jury] instruction" by misstating the elements necessary for *Pinkerton* liability. Gershman Opening Br. 32. During his closing argument, the prosecutor analogized *Pinkerton* liability to choosing among dinner options with friends:

> You are with your friends talking about dinner. You suggest Chinese food, but all your other friends suggest pizza. You don't object. Later that night, your friends buy a pizza. That was reasonably foreseeable to you. That's a natural consequence of that discussion.

App'x 1977. In essence, the prosecutor offered an analogy to show that, even if Appellants did not expressly agree to the arson plot, it was reasonably foreseeable to them that their coconspirators would commit the arson to further the gambling conspiracy after they heard their coconspirators lay out the arson plan and did not

---

[10] The evidence about what happened at this meeting came from a cooperating witness, Yusufov, who testified at trial that he was present at this meeting. Appellants go to great lengths to urge us to reject Yusufov's testimony, arguing that another testifying attendee did not share Yusufov's recollection. We will not do so. In reviewing a jury verdict, we "draw[] all inferences in the government's favor and defer[] to the jury's assessments of the witnesses' credibility." *Parkes*, 497 F.3d at 225 (quotations omitted).

object.  This analogy did not misstate reasonable foreseeability for purposes of criminal liability under *Pinkerton*.

Moreover, even if there were flaws in the analogy, Appellants do not meet their "heavy burden" of showing that the prosecutor's misstatement was "so severe and significant as to result in the denial of [the] right to a fair trial." *United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (quotations omitted).  "[T]he Government has broad latitude in the inferences it may reasonably suggest to the jury during summation."  *Id.* at 87 (quotations omitted).  And given the legally correct jury instruction and the strong evidence of reasonable foreseeability, the single analogy did not "rise to the level of prejudicial error."  *Id.* at 86 (quotations omitted).[11]

For many of the same reasons, Appellants' challenges to the sufficiency of the evidence supporting their arson conspiracy convictions fare no better.  To convict someone for conspiracy, "the government must present some evidence

---

[11] In any event, any error in including the illegal gambling conspiracy in the *Pinkerton* charge would be harmless.  Appellants were found guilty of arson conspiracy, and the arson was clearly a reasonably foreseeable result of that conspiracy.

Also, because Appellants cannot overcome harmless error review, we need not address the Government's argument that Appellants failed to preserve their challenge to the prosecutor's analogy, thus triggering plain error review.

from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Anderson*, 747 F.3d at 60 (quotations omitted). The Government may show "the defendant's knowing participation in a conspiracy through circumstantial evidence." *Id.* (quotations omitted). Relevant circumstantial evidence includes "a defendant's association with conspirators in furtherance of the conspiracy" and "his presence at critical stages of the conspiracy that cannot be explained by happenstance." *Id.* (quotations omitted).

The Government presented ample evidence to convict Gershman and Tsvetkov of an arson conspiracy. Again, Gershman and Tsvetkov joined in a meeting to discuss how to address the problem they were facing as a result of competition from the Voorhies Avenue Poker Spot. Gershman began the meeting by having everyone turn off their phones, which, as Yusufov explained, Gershman would do whenever they were having "meeting[s] about . . . street stuff." App'x 583. After Zelinger proposed setting the Voorhies Avenue Poker Spot on fire, Tsvetkov asked who would set the fire, with two other attendees soon being identified as the would-be arsonists. Gershman and Tsvetkov then both "nodded" their assent to the plan. App'x 589. This evidence allowed a reasonable juror to

conclude that Appellants agreed with the arson plan. *See United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018) ("[A] federal conviction may be supported by the uncorroborated testimony of even a single accomplice if that testimony is not incredible on its face." (quotations and alteration omitted)).

Nor did the *Pinkerton* instruction, as Appellants claim, risk having the jury "mistakenly infer the existence of the arson conspiracy from the combination of the substantive arson and the admitted membership in the gambling conspiracy." Gershman Opening Br. 36. In making this argument, Appellants point to language in *United States v. Sperling*, 506 F.2d 1323 (2d Cir. 1974), where we counseled against giving *Pinkerton* instructions when the jury would need to resort to *Pinkerton*'s inverse—that membership in the conspiracy must "be inferred largely from the series of criminal offenses committed"—to convict a defendant for conspiracy. *See id.* at 1342. But as discussed, evidence that Appellants took part in the arson conspiracy was strong—and the evidence of their participation in the gambling conspiracy was overwhelming. Thus, *Sperling*'s caution does not fit this case. *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (rejecting *Sperling* challenge when evidence that defendant was a conspiracy member was "overwhelming").

We therefore affirm Appellants' arson and conspiracy to commit arson convictions.

## III. CHALLENGES TO THE SENTENCES

Both Appellants also bring challenges to their sentences. Gershman argues that his sentence was procedurally flawed because the District Court incorrectly applied the obstruction of justice enhancement in calculating his Guidelines range. Tsvetkov argues that his above-Guidelines sentence of 198 months' imprisonment was substantively unreasonable. We address each argument in turn.

### A. Application of the Obstruction of Justice Enhancement to Gershman's Guideline's Range

The District Court applied an obstruction of justice enhancement for Gershman's conduct toward Dulevskiy, who was one of the extortion victims. After Gershman's arrest, Gershman's sister told Dulevskiy to meet with Gershman's lawyer, "keep [his] mouth" shut, and say that all the conversations that he had with Gershman were "like a friends kind of talk." App'x 988. Dulevskiy interpreted this conversation as a threat from Gershman. Later, Gershman asked his girlfriend to try to persuade Dulevskiy to write a false letter about Gershman's role in the crimes.

In calculating Gershman's Guidelines range, the District Court applied the obstruction of justice enhancement to the RICO base offense level. To do so, the District Court first calculated the highest offense level among the underlying racketeering acts to identify the RICO base offense level, and then enhanced that level for obstruction. Gershman maintains that the District Court erred because he did not obstruct the specific racketeering act that triggered the highest offense level, and the obstruction enhancement should have been applied only to those acts whose investigation or prosecution Gershman in fact tried to obstruct.

1.    *Standard of Review*

A sentencing judge procedurally errs when the judge "makes a mistake in its Guidelines calculation, does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." *United States v. Wernick*, 691 F.3d 108, 113 (2d Cir. 2012) (quotations omitted). We review challenges to an obstruction-of-justice enhancement under "a mixed standard of review." *United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003). We review for clear error the sentencing court's factual findings. *United States v. Cossey*, 632 F.3d 82, 86 (2d Cir. 2011). And we review *de novo* the court's "ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines." *Khedr*, 343

40

F.3d at 102 (quotations omitted). And in performing this *de novo* review, we give

"due deference to the district court's application of the guidelines to the facts." *Id.*

(quotations omitted).

2.      *Overview of Guidelines Application for RICO Offenses*

Understanding Gershman's challenge here requires a bit of background on

how the Guidelines work for a RICO conviction. For a defendant convicted of a

RICO offense, section 2E1.1 of the Guidelines provides the starting point for

calculating the Guidelines range. That section instructs that a defendant's base

offense level is the greater of nineteen, U.S.S.G. § 2E1.1(a)(1), or "the offense level

applicable to the underlying racketeering activity," *id*. § 2E1.1(a)(2). An

application note to section 2E1.1 guides courts on how to calculate the base offense

level when there are multiple underlying racketeering offenses. In those

circumstances, a court should:

> treat each underlying offense as if contained in a separate count of
> conviction for the purposes of subsection (a)(2). To determine
> whether subsection (a)(1) or (a)(2) results in the greater offense level,
> apply Chapter Three [adjustments] to both (a)(1) and (a)(2). Use
> whichever subsection results in the greater offense level.

U.S.S.G. § 2E1.1, cmt. n.1.

We have thus explained that, when calculating the base offense level for a

RICO conviction, a sentencing court must "treat[] each predicate act as if it were

41

contained in a separate count of conviction." *United States v. Ivezaj*, 568 F.3d 88, 99 (2d Cir. 2009) (quotations and alterations omitted). But after arriving at the base offense level, the sentencing judge no longer treats the underlying offenses separately. It instead takes the RICO base offense level and adds any sentencing enhancements to that offense level. *See id.* The predicate-by-predicate approach no longer applies at this point because section 2E1.1's "requirement to look at each individual act in a RICO offense is only for the purpose of establishing the base level offense, not for applying the Chapter Three adjustments." *Id.* Or said just a bit differently, section 2E1.1's Application Note 1 "does not say that the separate treatment [of the underlying offenses] extends . . . to application of the Chapter Three adjustments." *Id.* at 99 (quoting *United States v. Damico*, 99 F.3d 1431, 1437 (7th Cir. 1996)); *accord United States v. Lopez*, 957 F.3d 302, 308 (1st Cir. 2020); *United States v. Yeager*, 210 F.3d 1315, 1317 (11th Cir. 2000) (per curiam); *United States v. Coon*, 187 F.3d 888, 899 (8th Cir. 1999); *Damico*, 99 F.3d at 1437-38.

One of the Chapter Three adjustments is for obstruction of justice. *See* U.S.S.G. § 3C1.1. Section 3C1.1 of the Guidelines provides for a two-level enhancement "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the

investigation, prosecution, or sentencing of the instant offense of conviction, and

(2) the obstructive conduct related to (A) the defendant's offense of conviction and

any relevant conduct; or (B) a closely related offense." *Id.* Application Note 4(A)

further explains that an obstruction enhancement applies if a defendant

"threaten[s], intimidate[es], or otherwise unlawfully influenc[es] a . . . witness."

*Id.*, cmt. n.4(A).

Section 3C1.1 "thus contains two elements: (1) a temporal element, which

requires the obstruction to occur during the investigation, prosecution, or

sentencing of the offense of conviction and (2) a nexus element, which requires

that the obstructive conduct relate to the offense of conviction" or to "a closely

related offense." *United States v. Byors*, 586 F.3d 222, 227 (2d Cir. 2009) (footnote

omitted). The second element means that an obstruction of justice enhancement

only applies "if the court finds that the defendant willfully and materially

impeded the search for justice in the instant offense." *United States v. Zagari*, 111

F.3d 307, 328 (2d Cir. 1997).

But this "threshold for materiality is conspicuously low." *United States v.*

*Massey*, 443 F.3d 814, 821 (11th Cir. 2006) (quotations omitted). Section "3C1.1

establishes no general requirement that the obstruction succeed." *United States v.*

*Ventura*, 146 F.3d 91, 98 n.5 (2d Cir. 1998). Thus, in concluding that a mere misrepresentation in a financial affidavit for appointment of counsel was not obstruction, we explained that to "materially impede[] the search for justice" simply means that the defendant's conduct "*ha[s] the potential* to impede the investigation, prosecution, or sentencing of the defendant." *United States v. Khimchiachvili*, 372 F.3d 75, 80 (2d Cir. 2004) (emphasis added and quotations omitted); *see also* U.S.S.G. § 3C1.1, cmt. n.6 (defining "'[m]aterial' evidence, fact, statement, or information" as meaning "evidence, fact, statement, or information that, if believed, would *tend to influence or affect* the issue under determination" (emphasis added)).

And so, in the context outlined in Application Note 4(A), we have explained that the "obstruction-of-justice enhancement is warranted . . . when the defendant threatens, intimidates, or otherwise unlawfully influences a potential witness with the intent to obstruct justice." *United States v. Archer*, 671 F.3d 149, 166 (2d Cir. 2011). In those circumstances, "[a]n intent to deter cooperation with the government is sufficient" to warrant the enhancement. *Id.* The obstruction enhancement therefore even "applies where the targeted co-defendant or witness is still only a *potential* co-defendant or witness." *United States v. Agudelo*, 414 F.3d

44

345, 351 (2d Cir. 2005) (emphasis added and quotations omitted); *see Gaskin*, 364 F.3d at 465 ("A threat to a potential witness qualifies as an attempt to obstruct justice and fully warrants a sentencing enhancement pursuant to § 3C1.1.").

3. *Analysis*

Here, the District Court properly calculated Gershman's Guidelines range. Following section 2E1.1's requirements, the District Court first calculated the offense level for each racketeering act. The marijuana distribution activities, alleged as Racketeering Act 16, yielded the highest offense level. And because that level exceeded the U.S.S.G. § 2E1.1(a)(1) offense level of nineteen, the District Court used the marijuana offense level as the RICO base offense level. The District Court then turned to applying any adjustments under Chapter Three, including the two-level obstruction of justice enhancement under section 3C1.1.

This calculation also complied with *Ivezaj*. The District Court treated the underlying offenses separately "for the purpose of establishing the base offense level applicable to the RICO conspiracy." *Ivezaj*, 568 F.3d at 99. The court then applied the Chapter Three adjustments to the "RICO base offense level . . . by looking to the count of conviction . . . and all relevant conduct." *Id.* at 100 (quotations and alterations omitted).

Gershman contends that the District Court erred by applying the obstruction of justice enhancement to his entire offense of conviction for RICO, *i.e.*, after setting the RICO base offense level at the highest offense level among the underlying racketeering acts. In his view, section 2E1.1 required the District Court to apply this enhancement only to certain underlying racketeering acts and then to compare the resulting offense levels. In other words, Gershman argues that the District Court should have considered each underlying racketeering act and then determined whether Gershman's conduct pertaining to that act warranted an obstruction of justice enhancement. This would matter because, according to Gershman, he did not try to obstruct the marijuana distribution investigation or prosecution, and therefore the two-level obstruction of justice enhancement should not be applied to that racketeering act.

But that is the exact argument that *Ivezaj* rejected. Again, "the language of the Guidelines is clear that the requirement to look at each individual act in a RICO offense is only for the purpose of establishing the base level offense, not for applying the Chapter Three adjustments." *Ivezaj*, 568 F.3d at 99. Gershman has pointed to no intervening Supreme Court or *en banc* decision that overturned *Ivezaj*. *See United States v. Thomas*, 628 F.3d 64, 69 (2d Cir. 2010) ("It is well

46

established that a panel of this Court is bound by the decision of a prior panel unless the decision has been overturned either by the Supreme Court or this Court en banc.").

Besides *Ivezaj*'s controlling language, applying the obstruction enhancement to the entire RICO conviction makes sense when considering the conduct, and resulting harm, that RICO targets. Congress designed RICO "to remedy injury caused by a pattern of racketeering." *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 149 (1987). To remedy such harm, the statute punishes "the pattern of [racketeering] activity, not the predicates." *United States v. Basciano*, 599 F.3d 184, 205 (2d Cir. 2010). RICO, in other words, focuses on whether the predicate acts show sufficient relatedness and continuity to create a pattern of racketeering outlawed by section 1962's enumerated prohibited activities. *See RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2096-97 (2016) ("A predicate offense implicates RICO when it is part of a pattern of racketeering activity—a series of related predicates that together demonstrate the existence or threat of continued criminal activity." (quotations omitted)).

With this statutory framework in mind, it logically follows that obstruction of a racketeering predicate amounts to obstruction of the entire RICO offense. The

predicate act, after all, is part of the series of related acts that form the pattern of racketeering. And the engagement in that pattern of racketeering establishes an essential element of the RICO offense. Thus, when a defendant obstructs the investigation of a predicate racketeering act, that defendant obstructs the investigation of the overall racketeering offense. Viewed this way, Gershman's conduct had the potential of impeding the search for justice in connection with a predicate act that helped constitute the pattern of racketeering that led to his RICO convictions. *See Khimchiachvili*, 372 F.3d at 80. Moreover, the predicate acts were necessarily all "related" for them to form a pattern of racketeering activity. *RJR Nabisco, Inc.*, 136 S. Ct. at 2097. Even if a court were to consider each predicate racketeering act individually, obstructing the investigation into one predicate act would be "obstructive conduct related to . . . a closely related offense," U.S.S.G. § 3C1.1, reaching each of the other predicate acts.

Applying the obstruction enhancement to the full RICO offense—rather than merely to a lone racketeering act—thus makes sense here. The Indictment alleged sixteen racketeering acts, including the Dulevskiy extortion. As the District Court instructed, the commission of any two racketeering acts could have sufficed to establish a pattern of racketeering activity to support a finding of guilt

48

under RICO.  Obstructing the investigation or prosecution of any of those acts is therefore exactly how Gershman attempted to obstruct the investigation or prosecution of the overall enterprise.  So much like in *Ivezaj*, where we dealt with a role enhancement, "analyzing [Gershman's obstruction] in the overall RICO enterprise makes a good deal more sense than considering his [obstruction] in each underlying predicate."  568 F.3d at 99.  Otherwise, Gershman could dodge an obstruction enhancement despite obstructing the investigation and prosecution of an act that was (1) sufficient to form part of the basis to convict him of the RICO offense and (2) necessarily related to the other predicate acts.

## B.     The Substantive Reasonableness of Tsvetkov's Sentence

Lastly, Tsvetkov challenges the substantive reasonableness of his 198-month sentence.  Tsvetkov argues that this term of incarceration was unreasonable because it matched Gershman's sentence, even though Gershman was the more violent and culpable of the two,[12] and because Tsvetkov's sentence was above the advisory Guidelines range of 110 to 137 months.

---

[12] While the Government agreed at Tsvetkov's sentencing that Gershman was "[a] little more violent," App'x 2504, the Government pointed to various aggravating factors that demand a long sentence for Tsvetkov, including his criminal history, failure to rehabilitate, and conduct during pretrial detention.

When reviewing a district court's sentence for substantive reasonableness, we focus on the "district court's explanation of its sentence in light of the factors contained in 18 U.S.C. § 3553(a)." *United States v. Matta*, 777 F.3d 116, 124 (2d Cir. 2015) (quotations omitted). This review is not searching. "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). So we may find a sentence substantively unreasonable only when a sentence is "so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that affirming" the sentence "would damage the administration of justice." *United States v. Jones*, 878 F.3d 10, 19 (2d Cir. 2017) (quotations omitted).

In performing this review, we look to "the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. Our review "thus amounts to review for abuse of discretion." *United States v. Martinez*, 991 F.3d 347, 359 (2d Cir. 2021) (quotations omitted).

Here, the District Court did not abuse its discretion in imposing Tsvetkov's sentence. The District Court "considered all the factors under Section 3553(a)" and concluded that those factors supported an above-Guidelines sentence of 198

months' imprisonment. App'x 2510. The District Court specifically pointed to Tsvetkov's "history and characteristics" and his "violent tendencies" to support the upward variance. *Id.* at 2510-13.

The record supports the District Court's findings. Among other things, Tsvetkov's history and characteristics, and the danger he has posed to the community, supported a sentence above the advisory Guidelines range of 110 to 137 months. This is Tsvetkov's second federal racketeering conviction involving multi-year violent conduct. In his first conviction, he assaulted and tortured people using weapons, including a machete, a wooden board with nails protruding from it, and a firearm. Even after receiving a seventy-eight-month term of imprisonment for that first federal racketeering conviction, Tsvetkov failed to reform and comply with the law, instead opting to engage in the serious and violent conduct that gave rise to the convictions here. In imposing the sentence, the District Court noted that Tsvetkov has "a violent, angry streak that has been there [his] whole life," he is "not in control of that streak," and he "can't tamp it down." *Id.* at 2511-12.

When evaluating Tsvetkov's character and future dangerousness, the District Court also was disturbed by his lack of remorse. Rather, the District Court

observed that Tsvetkov somehow portrayed himself as a victim, which the court

understandably found highly troubling:

> You're not the victim here. The guy in the street that got his head beat
> in, that's a victim, that's one of your victims. Okay. The guy in whose
> mouth the gun got put, that's one of your victims[,] and I'm not seeing
> how the prior sentence that [was imposed for Tsvetkov's first
> racketeering conviction] has in any way gotten rid of this terribly
> dangerous persona that you have.

*Id.* at 2512.

And Tsvetkov's violent and criminal tendencies continued even after his

arrest in this case: he plotted retribution, assaults, and other fraudulent schemes

as well as made violent threats to his wife and girlfriend. For instance, during one

prison call, he reminded his girlfriend about a time when he struck her in the face,

and then threatened, "[W]hen I come out [of prison], I will put a hot iron on your

pu**y." Gov't Sentencing Exhibits at 57, *United States v. Tsvetkov*, No. 1:16-CR-

00553 (E.D.N.Y. June 27, 2019), ECF No. 444-1. In another call with his girlfriend,

he threatened to give her a "buck fifty," which, like a "150," refers to a slashing

wound that would require 150 stitches to a person's face. *Id.* He continued on this

call: "I will gladly see you . . . walking with a f***ing newborn or something, and

I'd just come up to you and give you a buck fifty . . . [a]cross your whole f***ing

mouth." *Id.* And Tsvetkov's words to his wife were equally threatening, telling

her that when he comes home, "[Y]ou b****, [you] will be f***ing killing yourself [when I get out of prison]. You will be on your knees, asking for forgiveness." *Id.* at 45. The District Court explained at sentencing that someone would only talk this way to women if the person "is revved up so high that [the person is] prone to outbursts and violence which define [the person's] life." App'x 2511.

As the District Court determined, Tsvetkov's violent actions show a man demanding substantial deterrence given the danger he presents to the community. All these factors pointed in favor of a substantial sentence.

Tsvetkov does not challenge any of these factual findings. He instead argues that his sentence is substantively unreasonable because he received the same sentence as Gershman despite Gershman having "a guideline sentencing range more than twice that of [Tsvetkov]." Tsvetkov Opening Br. 39. He contends that the District Court needed to compare the two of them and that his sentence should have been shorter than Gershman's. This argument misunderstands the law. To the extent that Tsvetkov suggests that the District Court violated section 3553(a)(6), which requires a sentencing judge to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), that provision

only "requires a district court to consider nationwide sentence disparities," not "disparities between co-defendants." *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). And moreover, as noted, the District Court conducted a careful and specific analysis of the appropriate sentence for Tsvetkov, and found that his unique background and violence history warranted an above-Guidelines sentence.

In sum, the District Court referred "to the factors listed in § 3553(a), and on this record we cannot say that the sentence it imposed exceeds the range of permissible decisions." *Matta*, 777 F.3d at 125 (quotations omitted).

## III. CONCLUSION

For all the reasons given, we affirm the District Court's judgment.

**AFFIRMED.**

DENNIS JACOBS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion in all but two respects. They are, however, consequential.

First, I conclude that the government failed to provide sufficient evidence of a racketeering enterprise. Defendants Leonid Gershman and Aleksey Tsvetkov committed—sometimes together, sometimes alone, sometimes with certain others, sometimes with a shifting cast of criminal acquaintances—acts that included, variously, gambling, extortion, marijuana distribution, loansharking, and other lines of felony. The government alleged that this grab-bag of ad hoc felonies were carried out pursuant to a criminal enterprise—which the government unilaterally named the "syndicate"—all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

This so-called "syndicate" had none of the ordinary hallmarks of an enterprise: it had no name, no hierarchy, no method for dividing profits, no rules of membership, no signs, no handshake. As the majority explains, none of these attributes is (on its own) necessary to survive a sufficiency challenge. But as the list of deficits becomes embarrassing, one must ask how "any rational trier of fact" can find an enterprise *beyond a reasonable doubt*." United States v. Bruno,

383 F.3d 65, 82 (2d Cir. 2004) (emphasis added) (citation omitted). It cannot be done. Accordingly, I would vacate Gershman's and Tsvetkov's conviction on the two racketeering counts and remand to the district court for resentencing.

Second, if that ruling does not obviate Gershman's sentencing challenge, I would conclude that the obstruction of justice enhancement should have been applied only to the single racketeering act that Gershman obstructed, rather than (as the majority rules) to the entire racketeering offense. So I would vacate Gershman's sentence and remand for resentencing under a new Guidelines range.

# I

Gershman and Tsvetkov argue that their convictions for substantively violating RICO and conspiring to violate RICO—Counts 1 and 2, respectfully—must be vacated for want of sufficient evidence. I agree.

"[A] valid RICO charge must allege the existence of both an enterprise and a pattern of racketeering activity."[1] Procter & Gamble Co. v. Big Apple Indus.

---

[1] A pattern of racketeering activity requires "[a]t least two predicate acts" that are "related and amount to or pose a threat of continued criminal activity." United States v. Burden, 600 F.3d 204, 216 (2d Cir. 2010) (internal quotation marks omitted).

2

Bldgs., Inc., 879 F.2d 10, 14 (2d Cir. 1989).  An enterprise "includes any . . . group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Such a group has "*at least* three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 946 (2009) (emphasis added).

The government ordinarily frames an enterprise as having the purpose of carrying out specified criminal activities, such as dealing drugs or illegal gambling.  See, e.g., United States v. Praddy, 725 F.3d 147, 155 (2d Cir. 2013) (dealing drugs); United States v. Mazzei, 700 F.2d 85, 89 (2d Cir. 1983) (illegal gambling).  The operative indictment, however, dismissively identifies the purpose of the syndicate as: "to generate money for its members."[2]  App'x 24.  Syndicate members allegedly furthered this purpose by committing "various criminal activities, including arson, extortion, narcotics trafficking, loansharking,

---

[2] Such sweeping purposes are rare and seemingly reserved for sprawling enterprises such as the Gambino crime family, which (at the risk of being obvious) this is not.  See, e.g., United States v. Pizzonia, 577 F.3d 455, 459 (2d Cir. 2009) ("The Indictment stated that the 'principal purpose' of the Gambino crime family was 'to generate money for its members and associates' through a wide range of criminal activities . . . .").

illegal gambling and extortionate collection of credit." Id. According to the

majority, this made the alleged enterprise akin to "a well-run business [that]

diversified its activities." Maj. Op. at 2. I cannot agree. Nor did the district

court, because its denial of the sufficiency motion was evidently a close thing. As

Judge Cogan observed:

> I just think in the absence of some kind of structure or
> hierarchy or sharing, pooling of profits from all of the
> criminal activities, I'm not sure there's more than a
> gambling conspiracy. I understand that the racketeering
> enterprise doesn't have a name. The Government refers
> to it as "The Syndicate," I'm just wondering maybe the
> reason it doesn't have a name is because you got a bunch
> of individual criminals who occasionally get together to
> join particular individual criminal acts, but it's not as if
> everything criminal they do yields a common benefit that
> is then divided in some prearranged way between them.
> . . . I have some little nagging doubt about the syndicate
> theory. But I think there's enough to at least hear what
> the jury has to say about it.

App'x 1712.

The majority opinion undertakes to show: (A) a pattern of racketeering

acts, (B) a hierarchy, (C) the sharing of proceeds, and (D) a rival crew, though the

majority elides the government's focus on (E) tattoos. But the evidence of any of

this is thin gruel, as explained below.

4

## A. Racketeering Acts

The majority begins by reverse-engineering an enterprise from a pattern of racketeering acts. That is, the majority reasons that because a shifting cast of criminals committed a series of crimes, there must have been an enterprise beneath it all. Support for this contention is lame: "[a]t least two criminal syndicate members committed eight of the nine extortions," and "[t]he syndicate members had broad involvements in the other crimes as well." Maj. Op. at 25.

The Supreme Court has largely foreclosed courts from conflating a pattern of racketeering acts with evidence of a racketeering enterprise: "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576, 583 (1981). And "[w]hile the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." Id. Such "particular cases" have been exceedingly rare, and arise only "where the enterprise was, in effect, no more than the sum of the predicate racketeering acts." United States v. Bagaric, 706 F.2d 42, 55 (2d Cir. 1983).

One of these rare instances is Mazzei, in which the trial court failed to charge that an "enterprise" must be separate and distinct from its "pattern of

5

racketeering activity." 700 F.2d at 87. The alleged enterprise had the purpose of "influenc[ing] by means of bribery the outcome of basketball games involving the Boston College varsity basketball team and to profit therefrom by wagering on those games." Id. at 88. That purpose "coalesce[d]," this Court concluded, with the pattern of racketeering activity, which was "to influence the outcome of [Boston College] basketball games." Id. at 88-89. The enterprise's purpose and pattern of racketeering activity were one.

This case is crucially different. The indictment alleged a wide assortment of criminal activities, making it impossible to deduce the purpose of the enterprise from the criminal acts alone. The majority sidesteps this point and focuses instead on the "considerable overlap in the individuals who committed the racketeering offenses." Maj. Op. at 25. But a Venn diagram of those involved in the two main businesses at issue—gambling and marijuana distribution— would have a narrow sliver of intersection that includes just Gershman and one other, and that excludes Tsvetkov and the rest of the supposed syndicate members.[3] In fact, three of the alleged members were involved in neither

---

[3] The gambling operation had six partners: Gershman, Tsvetkov, Renat Yusufov, Viktor Zelinger, Igor Krugly, and Vyacheslav Malkeyev. Of these, only Malkeyev was a part of Gershman's marijuana distribution business. That business, in turn, also included Eric Bobritsky and Librado Rivera.

6

operation; and two ran competing poker spots, one of which was torched by other members of the supposed enterprise.[4]

The majority also finds that "even when a member did not directly take part in a particular crime, that member would often still lend a hand."  Maj. Op. at 26.  One such helping hand was that Gershman would occasionally serve as the muscle for "Yusufov's cocaine business."  Id.  But this only confirms that the alleged syndicate members pursued separate lines of work: Yusufov had a cocaine business; Gershman had marijuana and loansharking businesses; and Tsvetkov had his own insurance fraud scheme.  The extra muscle occasionally used to carry out these operations (and a few ad hoc extortions) does not

---

The majority blurs things by claiming that Tsvetkov and Yusufov also "had roles in the marijuana distribution business."  Maj. Op. at 25.  In support, the majority notes that Tsvetkov acted as one of the "main suppliers" for that business.  Id.  But no evidence suggests that this relationship was anything but transactional: Gershman used other suppliers, Tsvetkov had other buyers, and there is no proof of sweetheart deals.  The majority also notes that Yusufov helped with a scheme that allowed the business to keep some marijuana without paying for it.  Id.  But Malkeyev testified that this scheme was the "*one time* [Yusufov] helped us out," and that neither Yusufov nor Tsvetkov "were involved in [the] marijuana business."  App'x 1113 (emphasis added).

[4] These three alleged members were Artiom Pocinoc, Isok Aronov, and Yusif Pardilov.  Pocinoc helped Gershman with a couple of extortions; Aronov and Pardilov ran separate poker spots; and Pardilov had his poker spot torched.

7

integrate these disparate enterprises.  As Judge Cogan explained, the alleged

members may have simply been "moons orbiting the same planet and sometimes

they crash into each other."  App'x 1712.

## B.    Hierarchy

A central point of contention is whether the syndicate had a hierarchy,

which is a hallmark of an enterprise.  A hierarchy need not take any particular

form, but it must be discernable.

The sort of organization RICO was intended to target had a prototypical

hierarchy such as that which existed within the Gambino crime family: there

were "various 'crews,' which consisted of a number of 'made' family members

. . . as well as associates.  Each crew was headed by a captain.  Each captain

reported to the family 'boss,' who was himself assisted by an 'underboss' and a

'consigliere' in supervising and protecting the family's overall activities."  United

States v. Pizzonia, 577 F.3d 455, 460 (2d Cir. 2009).

True, a hierarchy need not have such a rigid and ramified structure.  In

United States v. Applins, 637 F.3d 59 (2d Cir. 2011), no "Elk Block [gang] member

gave or obeyed orders"; nevertheless, "the evidence at trial indicate[d] that there

was *some form* of hierarchy."  Applins, 637 F.3d at 77-78 (emphasis added).

8

Specifically, there was evidence of a system whereby gang members "became 'senior members' through longevity and by 'graduating' from street sales to 'selling weight.'" Id. at 78. "[S]enior-member status meant that a member was older, financially wise, had sold a lot of drugs, and was one to whom other [gang] members could come for any type of help, including financial assistance." Id. That hierarchy was found to be weak; this one is undetectable.

The majority concedes that the syndicate "lack[ed] a formal structure or official titles," but asserts that there was still "a rough hierarchy in which certain individuals . . . were above [others]." Maj. Op. at 26. The majority adduces the salient evidence of this "rough hierarchy": Gershman used Bobritsky as a drug runner for his marijuana business; Yusufov asked Gershman's permission to use Bobritsky as a runner for his cocaine business; and while planning to burn down a competing gambling operation, Gershman asked everyone to turn off their phones, Tsvetkov asked for a volunteer, and Zelinger ultimately assigned the job to Yusufov and Malkeyev (whom the majority characterizes as "lower-level syndicate members"). Id. But the fact that certain individuals may have been more dominating, or commanded more respect, is a universal dynamic among

9

persons of differing experience and personality. To find a hierarchy here is to drain the word of meaning.

## C.    Proceeds

The majority discerns the existence of the syndicate from the shaky premise that "[t]he members also would share proceeds, with lower-level members often having no say in the cut they received." Maj. Op. at 27. But the majority lists only a handful of instances in which alleged syndicate members were paid for loansharking referrals, help with an extortion, or some other odd job. Such payments hardly demonstrate a system or practice for splitting proceeds; rather, they show that when one fellow lends a hand in a job, he can expect some thanks in cash. The majority refers to a single instance in which Gershman shared the proceeds of an extortion with someone not involved; but that was unique.

Similarly unpersuasive is the majority's reference to the sharing of proceeds among those involved in the marijuana business, as there is no evidence that money made from that business was shared with anyone outside its operation. Ditto the gambling business. The absence of evidence that the defendants pooled earnings is telling, given that the only "purpose of the

10

syndicate" posited in the indictment "was to generate money for its members." App'x 24. A few isolated payments do not amount to a pooling and distribution based on any agreed plan or practice. For all that the evidence shows, these criminal pursuits were distinct ventures.

**D. Rivals**

The majority considers that status as an enterprise is reflected by interaction with a rival gang. But the single incident the majority identifies amounts to no more than a burglary that went sideways.

In July 2012, Gershman, Malkeyev and Bobritsky discovered that a quantity of marijuana and several thousand dollars had been stolen from their stash house. After viewing surveillance footage, Gershman and Malkeyev thought they recognized the two burglars as "part of like a group of kids we called the Kafkazis that used to break into houses that had drugs or something worth of value in [them] and rob the houses." App'x 1086.

Gershman, Tsvetkov and Malkeyev tracked down one of the suspects, knocked him to the ground, and pistol-whipped him. After the beating, Malkeyev feared that the Kafkazis would retaliate, though the most they did was

11

chase Bobritsky in his car.[5]  Eventually, Gershman took back the marijuana from

the Kafkazis, but allowed them to keep the money they stole because it turned

out that the person they beat up was not involved in the break-in.  There is no

indication that there were any other incidents between the syndicate and the

"Kafkazi kids," or that they considered each other to be competitors or rivals.

App'x 1096.

**E.      Tattoos and Geographic Area**

Finally, the government emphasizes that the syndicate operated in and

around the Brighton Beach neighborhood, and that Tsvetkov received

permission from Russian Thieves to wear Thief star-tattoos on his body.  But a

neighborhood is not even impliedly a base of operations.  Cf. United States v.

Pierce, 785 F.3d 832, 838 (2d Cir. 2015) (finding that a housing development

constituted a "base of operations").  Moreover, Tsvetkov's tattoo was associated

with a group to which he did not belong, and it does not appear that any other

---

[5] The majority posits that this retaliation against Bobritsky, who was not involved in the assault, "suggests that others viewed Appellants' group as 'a continuing unit that function[ed] with a common purpose.'"  Maj. Op. at 29 (quoting Boyle, 556 U.S. at 948) (alterations in original).  But the entire feud began because the Kafkazis stole from Gershman's marijuana business, and Bobritsky was the drug runner for that business.  That Bobritsky might be the subject of retaliation shows his affiliation with Gershman's marijuana business, not with some overarching organization.

alleged syndicate member (including Gershman) had the same tattoo.  Cf. id. (noting that "members had tattoos and signs that signified their membership" in the enterprise).  Having conceived of a RICO enterprise, and having named it, the government argues that having *any* tattoo is proof of membership.

All we have left of this racketeering enterprise is a gambling business, a separate marijuana business, and a hodgepodge of ad hoc extortions and other crimes committed by people who know each other in the same neighborhood, and do not do affinity tattoos.  To find a sprawling enterprise under such circumstances is a long stretch; to do so *beyond a reasonable doubt* is irrational.

## II

The district court held that Gershman obstructed justice as to the overarching racketeering offense and therefore applied the 2-level obstruction enhancement to that offense as a whole.  The majority affirms the application of that enhancement, concluding that Gershman obstructed justice as to the entire racketeering offense and that, even if he obstructed justice only as to a single one

13

of the sixteen predicate acts, the 2-level enhancement nevertheless applies to the racketeering offense as a whole. I disagree.

The evidence at trial showed that, after his arrest, Gershman twice attempted to influence Denis Dulevskiy, a man who he had previously extorted. At the time, the operative indictment did not identify Dulevskiy as a "John Doe" victim, nor did it include a substantive extortion count based on Gershman's conduct towards Dulevskiy. But Gershman deduced that Dulevskiy would be a government witness because the government disclosed wiretap communications of Gershman threatening Dulevskiy, and quoted those threats in its memorandum requesting a permanent order of detention for Gershman. So, to be careful, Gershman twice tried to obtain a letter from Dulevskiy stating that the communications were "friends kind of talk." App'x 988.

The district court ruled that Gershman's solicitation of false testimony from Dulevskiy warranted an obstruction of justice enhancement, and that it should be applied to the racketeering offense as a whole, not just to the Dulevskiy extortion. The district court reasoned that "[o]bstructive conduct does not have to completely eliminate a particular charge against the defendant. It just is meant to get in the way of the particular charge and because there was a

14

racketeering charge here and this was part of it, I think it is the crime of conviction."  App'x 2423.

Accordingly, a 2-level obstruction enhancement was applied to all offenses underlying Gershman's racketeering conviction.  This included an enhancement to Gershman's marijuana distribution offense (even though Dulevskiy was in no way involved in that offense), raising that offense level from 36 to 38.  Based on that offense level of 38, the Probation Department calculated Gershman's Guidelines range to be 235 to 293 months' imprisonment.  The district court imposed a sentence of 198 months.

The application of the obstruction enhancement was error, as demonstrated by (A) the wording of the Guidelines; (B) the design of the sentencing calculation; and (C) the precedent on which the majority erroneously relies.  This error was not harmless.

A.    Wording

The threshold question is whether Gershman obstructed justice as to all the racketeering charges or only as to the Dulevskiy extortion.  This is a legal issue that is reviewed de novo.[6]  See United States v. Cassiliano, 137 F.3d 742, 745

_____

[6] The government contends that the district court's ruling on the obstruction enhancement was based on a factual finding, and asks us to review for clear

(2d Cir. 1998) ("A ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines . . . is a matter of legal interpretation and is to be reviewed <u>de novo</u>, giving due deference to the district court's application of the guidelines to the facts." (internal quotation marks and citations omitted)).

"An enhancement for obstruction of justice may . . . be granted if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense." <u>United States v. Zagari</u>, 111 F.3d 307, 328 (2d Cir. 1997). The Guidelines itself prescribes:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

---

error. But only the district court's "findings as to what acts were performed, what was said, what the speaker meant by her words, and how a listener would reasonably interpret those words" are considered factual issues considered under the clearly erroneous standard. <u>Cassiliano</u>, 137 F.3d at 745. None of those things are at issue on appeal.

16

U.S.S.G. § 3C1.1. The "instant offense of conviction" here is racketeering. Thus, the question is whether Gershman "willfully and *materially* impeded the search for justice" in that offense, with respect to its investigation, prosecution, or sentencing. He did not.

The racketeering offense contained sixteen predicate acts, of which fifteen acts could not have been affected by Gershman's tampering with Dulevskiy, which was the only evidence of obstruction the government offered. Since the jury had to find Gershman guilty of only two of the sixteen predicate acts to find a pattern of racketeering activity, the Dulevskiy obstruction could materially impede the investigation and prosecution of a single predicate act *without* materially impeding the investigation or prosecution of the racketeering charge as a whole. And since the Dulevskiy extortion had no impact on Gershman's offense level (which was determined entirely by the marijuana offense), the obstruction did not materially impede sentencing either.[7]

---

[7] The government argues that Gershman's conduct could not have related only to the Dulevskiy extortion because at the time he engaged in his obstructive behavior "neither of the operative indictments included any Dulevskiy-related charges, or identified any victims, for that matter." Appellee Br. at 108. But the initial indictment charged Gershman with conspiracy to engage in extortionate collection of credit in violation of 18 U.S.C. § 894(a). The indictment may not have specifically named Dulevskiy, or any other individual, but such detail was

17

The majority arrives at a different conclusion by lowering the standard for obstruction, quoting an out-of-circuit case which characterizes the "threshold for materiality [a]s conspicuously low." Maj. Op. at 43 (quoting United States v. Massey, 443 F.3d 814, 821 (11th Cir. 2006) (citation omitted)). That statement, however, is based on the Guidelines' definition of "'Material' evidence," U.S.S.G. § 3C1.1 cmt. n.6, which is irrelevant for our purposes. The issue here is not whether certain evidence was material, but whether (under *this Court's* precedent) Gershman "materially impeded the search for justice." Zagari, 111 F.3d at 328.

Citing United States v. Khimchiachvili, 372 F.3d 75 (2d Cir. 2004), the majority argues that "to 'materially impede the search for justice' simply means that defendant's conduct '*has the potential* to impede'" the search for justice. Maj.

---

not necessary for Gershman to infer that the Dulevskiy extortion would be included in the charge. And even if the initial indictment had contained no extortion charge, Gershman's obstruction would have been aimed at the one that inevitably loomed. See United States v. Riley, 452 F.3d 160, 166 (2d Cir. 2006) ("The Guidelines recommendation of a sentencing enhancement for obstruction is not limited to obstructions or obstructive attempts that occur during the prosecution of the offense of conviction, but explicitly extends as well to obstructions or attempts that occurred during the 'investigation' of that offense." (citing U.S.S.G. § 3C1.1)).

Op. at 44 (quoting <u>Khimchiachvili</u>, 372 F.3d at 80) (alterations adopted).  This

gambit allows the majority to argue that Gershman obstructed justice as to the

sprawling racketeering offense because his "conduct had *the potential of* impeding

the search for justice" in that offense.  Maj. Op. at 48 (emphasis added).   But

<u>Khimchiachvili</u> did not purport to clarify or lower the materiality standard set

forth in <u>Zagari</u>.  It sensibly observed that if conduct could not possibly impede

the search for justice—in that case, swearing to a false financial affidavit in order

to obtain court-appointed counsel—it cannot constitute obstruction.  <u>See</u>

<u>Khimchiachvili</u>, 372 F.3d at 80.

The salient error of the majority opinion is to say that any act of

obstruction, however local to a single predicate act, authorizes a district court to

enhance the sentence for a racketeering offense as a whole.  That view offends

principles of logic and lenity.

## B.    Design

Since Gershman did not obstruct the racketeering offense as a whole, his

obstruction enhancement should not apply to the racketeering offense as a

whole.  Unsurprisingly, the Guidelines adopt this common-sense approach.

19

The Guidelines direct sentencing courts in calculating the base offense level for RICO convictions to apply the greater of: "[a](1) 19; or [a](2) the offense level applicable to the underlying racketeering activity."  U.S.S.G. § 2E1.1.  The base offense level for a RICO offense, as set out in Application Note 1 to that Guidelines, is determined in three steps (which I number in bold):

> **[1]** Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2).
> **[2]** To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, *C [obstruction]*, and D to both (a)(1) and (a)(2).
> **[3]** Use whichever subsection results in the greater offense level.

U.S.S.G. § 2E1.1, cmt. n.1.

At the first step, the sentencing court groups together all counts involving substantially the same harm.  See U.S.S.G. §§ 3D1.1; 3D1.2.  This resulted in Gershman's racketeering acts being split into eleven groups.  The two groups with the highest base offense level—i.e., the highest offense level before applying adjustments—were those for marijuana distribution and arson, which each had a base offense level of 24.  Applying the specific offense characteristics of Chapter Two—i.e., enhancements that apply if for example a firearm was used in the

offense—raised the offense level for marijuana distribution to 32, which was the highest level among the underlying offenses.  See U.S.S.G. § 1B1.1.

At step two, courts apply Chapter Three adjustments to both (a)(1) and (a)(2) to determine which subsection results in the greater offense level.  In this case, the only chapter three adjustments applied were a 4-level role enhancement for marijuana distribution and the 2-level obstruction enhancement for all underlying offenses.  These adjustments brought marijuana distribution to an offense level of 38, which was higher than the (a)(1) number (19 plus the 2-level obstruction enhancement).  It was also higher than the offense level for all the other (a)(2) underlying offenses (the next highest being arson with 26).

At step three, the district court adopted 38 as the Guidelines offense level.

This bring us to the next issue as to which I part company with the majority: whether the Guidelines' wording contemplates instances in which Chapter Three adjustments would apply to certain individual offenses without affecting the racketeering offense as a whole.  It does, as a matter of arithmetic.  The reason to "apply Chapter Three . . . to both (a)(1) and (a)(2)" is "[t]o determine whether subsection (a)(1) or (a)(2) results in the greater offense level."  If the *same* enhancements had to be applied to *both* subsections, then application

of the enhancements would add equal weight to both subsections and would be of no use "*to determine*" which of the two subsections results in the greater offense level. This inquiry presented in step two then has meaning only if there are instances in which Chapter Three adjustments are applied only to subsection (a)(1) or only to (a)(2).[8] A disparity in weight can arise only if (a)(2) "treat[s] each underlying offense as if contained in a separate count," while (a)(1) (which simply assigns a base of 19) does not. To repeat, the Guidelines necessarily contemplate instances in which adjustments would apply only to individual predicate acts—i.e., only to (a)(2).

The upshot of all this is that the district court should have applied the 2-level enhancement for obstruction of justice only to the predicate act that Gershman obstructed—i.e., to the Dulevskiy extortion. The corollary is that the enhancement should *not* have applied to the unrelated marijuana offense or to the racketeering offense as a whole. The proper calculation would bring Gershman's RICO offense level down from 38 to 36. This makes sense. Section 3C1.1 of the Guidelines provides that the 2-level enhancement applies if a

---

[8] The application of the Chapter Three adjustments did not influence which subsection—(a)(1) or (a)(2)—provided the base offense level in this case, but it is not difficult to imagine cases in which it would.

defendant materially impedes the "investigation, prosecution, or *sentencing* of the instant offense of conviction." U.S.S.G. § 3C1.1 (emphasis added). Had Gershman obstructed the marijuana offense, he would have materially impeded sentencing, and the 2-level enhancement would have properly attached. Since Gershman's obstruction of the Dulevskiy extortion had zero impact on his sentencing, or his conviction more generally, the 2-level enhancement amounts to an arbitrary piling-on. To the extent there is any ambiguity in the Guidelines regarding the obstruction enhancement (there is not), we should apply the rule of lenity and resolve that ambiguity in the defendant's favor.[9]

## C.    Precedent

The majority is pleased to discover that this Court already resolved this "exact" issue in United States v. Ivezaj, 568 F.3d 88 (2d Cir. 2009). Maj. Op. at 46.

---

[9] This Court has "assumed without directly concluding that the rule of lenity applies to advisory (as opposed to mandatory) Guidelines." United States v. Young, 811 F.3d 592, 609 n.1 (2d Cir. 2016) (Lohier, J., concurring) (citing United States v. McGee, 553 F.3d 225, 229 (2d Cir. 2009); United States v. Rivera, 662 F.3d 166, 186 (2d Cir. 2011) (Katzmann, J., concurring)). "Where, as here, the text of the relevant Guidelines provisions and application note is unclear about whether [an enhancement] is permitted, the rule of lenity should apply to foreclose it." Id. at 609.

But the Ivezaj holding, which was based on materially different facts and issues, does not reach this case.

Ivezaj concerned the application of role (or leadership) enhancements and, more specifically, how those enhancements apply when a defendant was the leader of an entire racketeering enterprise. The defendant had argued "that any aggravating role enhancement the district court applied should have been based on the conduct alleged in the underlying predicate acts, rather than on his role in the RICO enterprise as a whole." 568 F.3d at 99. That argument was rejected on the sound reasoning that "it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts." Id. Thus, "a defendant who served as a leader or manager of an extensive RICO enterprise should not be able to avoid a role enhancement simply because certain predicate acts involved fewer than five participants or criminal activity that was not extensive." Id. In short, Ivezaj held that a defendant who leads an entire RICO enterprise should be sentenced as if he had led the entire RICO enterprise.

The majority reads Ivezaj to mean that Chapter Three adjustments must *always* be applied to the overall racketeering offense and, therefore, Gershman's

24

obstruction of justice enhancement is automatically applied across the board.

The majority over-reads the following observation in <u>Ivezaj</u>: "the language of the Guidelines is clear that the requirement to look at each individual act in a RICO offense is only for the purpose of establishing the base level offense, not for applying the Chapter Three adjustments." <u>Id.</u> <u>Ivezaj</u> held that the *requirement* in Application Note 1 to treat each underlying offense as an individual count did not extend to application of the Chapter Three adjustments; the Court did not impose its own requirement (found nowhere in the Guidelines) that Chapter Three adjustments *may never* apply to individual underlying offenses.

<u>Ivezaj</u> provides flexibility. Naturally, when a defendant leads an entire enterprise, the role adjustment should be applied across the board; but if a defendant leads only a single underlying offense, the role adjustment should be applied to that underlying offense alone. Similarly, one may obstruct justice as to a sprawling enterprise; but here it is easy to identify the particular underlying offense that was obstructed—that offense, and no other. The analysis is case-specific, not categorical.

<u>Ivezaj</u>'s flexible approach is illustrated by the district court's handling of Gershman's leadership enhancement. The district court concluded that

25

Gershman did not lead the syndicate,[10] but that he did lead the marijuana distribution business. Accordingly, it applied the 4-level role enhancement only to the marijuana distribution offense, and no others.[11] Id. The majority's holding would cast that sound ruling into error. Moreover, the majority prescribes a rule that will impose the same penalty whether the defendant leads a sprawling enterprise or an individual and isolated offense. So much for proportionality.

## D. Harm

Had the obstruction enhancement been limited to the Dulevskiy extortion, Gershman's offense level would have dropped from 38 to 36, and his Guidelines range would have fell from 235-293 months to 188-235 months. The government

---

[10] The district court stated that "the ways in which [Gershman] led were not the kind of global leadership things" contemplated by the enhancement, because what he did "was not the overall planning and specializing, and maybe it's my view that the guidelines are more geared towards traditional organized crime and the leadership enhancement particularly is more geared toward it." App'x 2416. That Gershman was not responsible for the "overall planning" of the enterprise is unsurprising given that there was no enterprise with an overall plan.

[11] Because the marijuana act drove Gershman's offense level, applying the 4-level enhancement to that offense had the same practical effect of applying it to the racketeering act as a whole, a feature that the district court observed was a "little troubling." App'x 2452. However, there would of course be many instances in which applying a leadership enhancement globally would have a different effect than applying it only to a predicate act.

contends that any error on the obstruction issue would be harmless, despite its impact on the Guidelines range, because "the record indicates clearly that the district court would have imposed the same sentence in any event." Appellee Br. at 113 (quoting United States v. Jass, 569 F.3d 47, 68 (2d Cir. 2009)). The record shows no such categorical statement.

The government relies on Jass, in which the Guidelines "range" provided for life, but the district court exercised its discretion to sentence the defendant to a non-Guidelines sentence of 65 years. 569 F.3d at 54. The Court in Jass identified a procedural error in the application of a 2-level enhancement to her Guidelines calculation, but found that error to be harmless because "the district court unequivocally stated that it would impose the same 65-year sentence on [the defendant] however the [enhancement issue] ultimately works out [on appeal]." Id. at 68 (third alteration in original).

Here, the sentencing judge kept the Guidelines range in view, notwithstanding that he was "not going to give the guidelines *as much weight* as the Government would like." App'x 2453 (emphasis added). Elsewhere, the judge stated that the "guidelines are advisory and as Probation has calculated them now, I am not giving a guidelines sentence. So I'm not sure any of this

27

matters anyway, except adhering to required procedures." Id. at 2452. This does not amount to a categorical resolve to impose the same sentence no matter what. Because the district court indicated that it was giving the Guidelines *some* weight, a lower Guidelines range might have resulted in a lower sentence. As emphasized in Molina-Martinez v. United States, 578 U.S. 189 (2016): "When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." 578 U.S. at 198. This is because the "Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar." Id.

Following Molina-Martinez, this Court has been reluctant to deem harmless an error in calculating a Guidelines range. For example, United States v. Bennett, 839 F.3d 153 (2d Cir. 2016), as amended (Oct. 7, 2016) held such an error was not harmless even though the district court stated that it was "not moved by" the Guidelines, and imposed a seven-year below-Guidelines sentence. 839 F.3d at 163. A panel of this Court came to the same conclusion with respect to harmlessness in United States v. Lopez, 724 F. App'x 90 (2d Cir.

2018), despite the district court's statement that it "will not impose a guideline sentence." 724 F. App'x at 91.

Would the district court have sentenced Gershman to 198 months' imprisonment even if his Guidelines range had been 188-235 months as opposed to 235-293 months? Doubt on this point should be resolved by the district court.

## CONCLUSION

The majority affirms a racketeering conviction based on a phantom enterprise, and holds that Gershman obstructed justice as to this sprawling racketeering offense by meddling with only one of its sixteen predicate acts. I respectfully dissent.